Argued December 14, 1949; reversed and remanded March 28, 1950

# MANNING LUMBER CO. *v.* VOGET

216 P. (2d) 674

*W. C. Schwenn,* of Hillsboro, and *Leo Levenson,* of Portland, argued the cause for appellant. With them on the brief was Mervin W. Brink, of Hillsboro.

*Francis E. Sturgis* argued the cause for respondent. With him on the brief were W. G. Hare and James E. Burdett, all of Hillsboro.

Before Lusk, Chief Justice, and Rossman, Bailey, Hay, and Page, Justices.

BAILEY, J.

The proceeding before us was instituted as an action at law. Plaintiff, Manning Lumber Company, a corporation, filed a complaint in which it sought to recover $11,600 from defendant, F. A. Voget, alleged to be the balance due plaintiff from defendant on a contract of sale of real and personal property.

Defendant, in his amended answer, denies that plaintiff "has performed all conditions precedent required by the said contract to be performed by plaintiff", and further denies that he is indebted to plaintiff in any sum whatsoever. In his first, further and separate answer he alleges that plaintiff and defendant executed the contract which forms the basis of plaintiff's complaint; that plaintiff agreed to deliver to him, among other things, "all logs on hand in the pond and on the premises of said real property [described in the contract], being 602,000 board feet of logs, more or less"; that plaintiff failed and neglected to deliver to him 602,000 board feet of logs and has, in fact, delivered only 294,433 feet of logs, for which he has paid the agreed value thereof, to wit, $20 per thousand; and that he has paid to the plaintiff the sum of $9,488.66, "which is payment in full for all of the real and personal property delivered by the plaintiff unto the defendant."

In his second, further and separate answer defendant alleges that plaintiff and defendant executed the contract previously mentioned; that preliminary to entering into said contract, defendant negotiated with plaintiff's authorized agent who represented to defendant "that there were 602,000 feet of logs in the pond and in the cold decks on the real property in said contract described"; that said agent "represented

to the defendant that all of the logs in said cold decks were accurately scaled at the time said logs were delivered to the real property" described in the complaint; and that plaintiff's records "showed the scale of 602,000 feet". Defendant further alleges that, in entering into said contract, he relied upon such representations and "agreed to purchase the real property and the personal property particularly described in the contract"; that the "purchase price of said real property and premises was based upon the following computation:

| | |
|---|---|
| 600,000 ft. of logs at $20.00 per thousand | $12,000.00 |
| Land | 1,000.00 |
| One skyline completely rigged, together with two-drum donkey with lines | 1,500.00 |
| Additional real property formerly sold by the plaintiff to one Hicks | 1,100.00 |

making a total purchase price of $15,600.00, as set forth in the contract attached to plaintiff's complaint"; that it was impossible to secure an accurate scale of the logs; that "said representation of 602,000 board feet of logs was a mistake on the part of" plaintiff's agent, and "said mistake was relied upon by the defendant in entering into said contract and the amount of money that should be paid for said logs; that said mistake was mutual and in truth and in fact there were only 294,433 feet of logs and no more"; that defendant has paid to the plaintiff $9,488.66, which amount "pays the plaintiff in full for all property sold under said contract at the agreed prices therefor and that by reason of the representations of the plaintiff's agent and the reliance placed upon said representations by the defendant, the mistake of the parties being mutual, the purchase price of said contract should abate and be reduced in the sum of $6,111.34 by reason

of the failure of the plaintiff to deliver a minimum of 600,000 feet of logs under and pursuant to said contract.''

For a ''further, separate and equitable defense'' defendant realleges all the allegations contained in the second, further and separate answer. It is then alleged that the mistake as to the quantity of logs ''was a mutual mistake and that in truth and in fact there were only 294,433 feet of logs and no more'', and that the contract between plaintiff and defendant ''should be reformed to show 294,433 board feet instead of 602,000, as represented by plaintiff and relied upon by the defendant; and that by reason thereof, the purchase price in said contract should be reformed to show the full consideration for the purchase as $9,488.66 instead of $15,600.00 as shown in said contract.''

The affirmative matter set forth in defendant's further and separate answers is denied in the amended reply.

After a hearing the court entered a decree reforming the contract ''to show the quantity of logs as 350,000 feet of logs, more or less, instead of 602,000 feet of logs, more or less, and that the total purchase price of the property particularly described in said contract be reduced from $15,600 to $10,600.00.'' It was further ordered and decreed that plaintiff have judgment against defendant for the sum of $1,111.34. From this decree plaintiff has appealed.

The facts are substantially as follows: On or about April 3, 1947, plaintiff and defendant entered into a contract whereby plaintiff agreed to sell, and defendant agreed to purchase, certain described real and personal property in Washington County, State of

Oregon. The contract describes approximately 10 acres of land by metes and bounds, and the rest of the property as follows:

"(b) All logs on hand in the pond and on the premises of said real property, being 602,000 board feet of logs, more or less;

"(c) One skyline completely rigged, together with two drum donkey with lines;

"(d) All buildings and all water rights in connection with said real property".

The purchase price for the real and personal property was $15,600.00, $500.00 of which was paid as earnest money; $2,000.00 was, upon the execution of the contract, to be deposited in escrow; $1,500.00 was to be paid on or before April 15, 1947; and the balance of the purchase price, to wit, $11,600.00, "to be paid as the logs sold hereunder are moved or cut up, but said balance to be paid not later than 90 days from the date of this contract."

C. K. Rose represented the plaintiff corporation in the negotiations leading up to and culminating in the execution of the contract here involved. Voget testified that his main interest in the transaction was the purchase of the logs. He stated that Rose told him that the logs had been properly scaled by competent men "and that whatever defects were in the logs had been duly taken into consideration, so that there were 602,000 feet of merchantable logs in cold-deck." He testified that Rose had told him that the logs had cost plaintiff between $22 and $23 a thousand, and that in arriving at the $15,600.00 mentioned in the contract they (Rose and Voget) had figured 600,000 feet of logs at $20 per thousand, aggregating $12,000, and that Rose had placed the value of the land at $1,000, the skyline completely rigged, together

with two drum donkey, at $1,500, and additional real property, formerly sold by plaintiff to one Hicks, at $1,100. He stated that he had looked over the property before purchasing it, but that "It was impossible, physically impossible to scale the logs under the conditions they were in. * * * Because the way they were piled in a criss-cross way it would have been impossible to get to all of the logs that were in the pile." He further stated that he had discussed with Rose the quantity of logs and told him that he "had some doubts about as to whether the total quantity was there, but he assured me that there were 602,000 feet of logs in the pile, they had been properly scaled and he didn't hesitate to testify, to stand behind that figure, * * *." He stated that there were actually less than 300,000 feet of logs. He admitted that after the execution of the preliminary contract and before signing the final one, he requested that there be added, after the amount of logs stated in the contract, the following: "If a shortage greater than 5% vendors to give credit on contract for such shortage as is in excess of 5% at the rate of $20 per thousand". He stated in reference to this: "All that Mr. Rose said was that the contract would stand as it was written and I was fully safe as far as the amount of logs was concerned; I told him that is all I wanted to know and I signed the contract."

Mrs. Gertrude Berger, who was bookkeeper at the Gales Peak Lumber Company operated by the defendant, testified that she was present at the conferences held on March 15th and 22nd between Rose and Voget and that Voget and Rose discussed the sale of the property of the Manning Lumber Company and that "the main point were the logs." She further

testified that they discussed the value of the items making up the contract, and that in arriving at the total amount of the contract the figures mentioned by Voget were used.

Mr. Rose testified that in arriving at $15,600 plaintiff "put arbitrary prices on the main assets and the holdings"; that it placed $12,000 on the logs, $1,000 on the land, $1,500 on the donkey and skyline, and $1,100 on the Hicks property. He further testified that he believed there were 602,000 feet of logs and that he accepted the inventory which was kept by the bookkeepers and scalers. He stated that the Manning Lumber Company was trying to dispose of everything it owned for a lump sum of money; that he made that fact known to Mr. Voget "on every occasion that we discussed it"; and that Voget "had to take everything or it wasn't any deal."

Under date of March 22, 1947, plaintiff and defendant entered into a memorandum agreement which reads in part as follows:

"Manning Lbr. Co. agree to sell to F. A. Voget his entire holdings at the old Parry Mill Site, at Manning, Ore. consisting of: 10 acres of ground. 602M' of logs (more or less) One skyline completely rigged, also two drum donkey with lines. All water rights, buildings etc.

"F. A. Voget agrees to purchase all of the above at a total price of $14,500 (fourteen thousand five hundred), on following terms: * * * "

This agreement further provides that Joe Czerwick agrees to assign to F. A. Voget an option he now holds with C. Z. Hicks "covering the house and land sold to this party for the sum of $1000.00". In arriving at the total amount which was inserted in the con-

tract of April 3rd, the plaintiff computed this property on the basis of $1,100.

In reference to the March 22nd agreement Rose testified as follows:

"Q. Was there any discussion put in this contract, this agreement of March 22nd, 1947, 602,000 of logs, more or less at Twelve thousand dollars, did the discussion incorporate that in this agreement? A. As I say, the agreement was drawn before I saw it.

"Q. Even before this agreement was drawn had there ever been any discussion that you would break down in the contract 602,000 feet of logs, more or less, at Twelve thousand dollars? A. No, there never had been.

"Q. Was there any discussion of breaking down one skyline completely rigged, also two drum donkey with lines at $1500? A. No, sir.

"Q. Was there any discussion of putting a price—against negotiating four items named in the memorandum? A. No, sir.

"Q. So that, is it fair to say that this memorandum of March 22nd, 1947 represented the agreement of the parties? A. That is correct."

We quote further from Rose's testimony:

"Q. Now, what can you tell us about what transpired after the signing of this memorandum of March 22nd, 1947 and until the contract of April 3rd was signed? A. On several instances we were contacted with regard to putting a rider in there allowing for percentage of logs in case there was a shortage or getting a differential in price, and Mr. Voget talked to me about it on two or three different occasions. Any time it was discussed, it was always my answer that the contract would have to be signed as written or it wasn't any

deal because we wanted to get rid of all the property at one time, or start negotiating with someone else.

"Q. You are talking about a price based on the differential; do you remember how that came about? A. In case possibly that there should have been a shortage of logs—I didn't pay too much attention to it for the simple reason Mr. Voget would either sign the contracts as originally written or there wouldn't be a contract.

\* \* \*

"Q. (Mr. Schwenn) You say there was some discussion of a reduction in price after the original memorandum was drawn. Do you remember just what the facts were on that? A. I don't remember the detail simply for the reason I believe in addition to Mr. Voget contacting me Mr. Sturgis had contacted you about getting protection there of some sort of law or showing less than was carried by the contract in a gross amount, which we didn't agree to.

"Q. In other words, they were asking for a reduction in the purchase price at the rate of twenty dollars a thousand if a shortage developed greater than five per cent, is that right? A. I believe that is correct, yes.

"Q. What was your answer as to that? A. There would be nothing in it at all except as the contract was written originally.

"Q. Did you talk with Voget as to that? A. I did.

"Q. What did you tell him? A. I told him the same thing, unless the contract was signed as it was written the deal was off."

Rose testified that he would not have represented to Voget that there were 602,000 feet of logs if he had

known there were "in round figures only 300,000 feet of logs on the premises".

After the defendant had taken possession of the property and was able to make an accurate scale of the logs, he discovered that all "logs on hand in the pond and on the premises" totaled, according to his computation, only 294,433 board feet. He thereupon notified the plaintiff of the discrepancy.

It was stipulated at the trial and found by the court that defendant had paid to plaintiff the sum of $9,488.66.

■ Where defendant, in a law action, is entitled to relief arising out of facts requiring the interposition of a court of equity, and material to his defense, he may set such matter up by answer in such action. § 9-102, O. C. L. A. In the instant case the defendant has set forth three separate and further answers, in one of which he asks for equitable relief, to wit, the reformation of the contract sued upon by the plaintiff. In support of his contention that equity has jurisdiction to grant the relief which he asks, defendant quotes from *Massachusetts Protective Ass'n v. Palmer,* 141 Or. 688, 692, 18 P. (2d) 585, as follows: "It is a rule of general application that the contract as written by the parties shall be held to embody all prior and contemporaneous agreements and, therefore, that evidence of matters outside the instrument cannot be admitted to control its legal effect. * * * But a court of equity has power to reform an instrument so that it will express the actual agreement of the parties, where there has been a mutual mistake or a mistake upon the part of one and fraud or inequitable conduct on the part of the other".

■ We find in 2 Pomeroy's Equity Jurisprudence, 3rd Ed., § 870, p. 1540, the following well-established rule relative to the matter under discussion:

" * * * Reformation is appropriate, when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all the parties interested, but in reducing such agreement or transaction to writing, either through the mistake common to both parties, or through the mistake of the plaintiff accompanied by the fraudulent knowledge and procurement of the defendant, the written instrument fails to express the real agreement or transaction. In such a case the instrument may be corrected so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties. * * * "

The same rule is thus expressed in 45 Am. Jur., Reformation of Instruments, § 7, p. 586:

"Inasmuch as the relief sought in reforming a written instrument is to make it conform to the real agreement or intention of the parties, *a definite intention or agreement on which the minds of the parties had met must have pre-existed the instrument in question.* Moreover, the agreement must, with a few exceptions, be a binding one in law, having all the necessary elements of a binding contract. The prior agreement or intention must, of course, differ from the instrument in question or there would be no ground for relief. The difference must be affirmatively and clearly shown, and it must be further shown that the difference was due to fraud or mistake." (Emphasis added.)

See to the same effect: 53 C. J., Reformation of Instruments, § 59, p. 941. *Roesch v. Equitable S. & L. Ass'n,* 176 Or. 7, 153 P. (2d) 525; *L. B. Menefee Lumber Co. v. Gamble,* 119 Or. 224, 242 P. 628, and the many

authorities therein cited; *Spexarth v. Rhode Island Ins. Co.*, 118 Or. 22, 245 P. 515; *Dolph v. Lennon's, Inc.*, 109 Or. 336, 353, 220 P. 161.

It is asserted by defendant that the agreement signed by plaintiff and defendant, a copy of which is attached to the complaint as an exhibit, is not the real agreement of the parties. His answer does not clearly set forth the terms of what he claims was the real contract between him and plaintiff. In his first affirmative answer he alleges that plaintiff has delivered to him "only 294,433 feet of logs" and that "the agreed value of the logs between the parties hereto was $20.00 per thousand." Again, in his second, further and separate answer, defendant infers that the price of the logs was $20.00 per thousand.

Previously we have pointed out that defendant, before signing the agreement here involved, requested that it be modified so as to provide that, if there was a shortage greater than 5% of the 602,000 feet of logs mentioned in the contract, he should be given credit for the shortage, if any, in excess of 5% at the rate of $20.00 per thousand. Defendant stated that plaintiff refused his requested change and told him "that the contract would stand as it was written", and that, upon plaintiff's assurance that he "was fully safe as far as the amount of logs was concerned", he signed the agreement.

The contract as made for the parties by the court was more favorable to the defendant than the executed contract with defendant's suggested modification. Such proposed change, as previously stated, was rejected by plaintiff. By the decree the executed contract was reformed by reducing the purchase price of the real and personal property described therein from

$15,600 to $10,600, or $5,000, which deduction was based upon a shortage, found by the court, of 250,000 feet, computed at $20.00 per thousand. Under the change in the contract requested by defendant, but not adopted, he would have been given credit of $20.00 per thousand feet only for the shortage, if any, in excess of 5% of the 602,000 feet, whereas the court gave him credit, computed at $20.00 per thousand feet, for the entire shortage under 600,000 feet.

■ It was, however, never agreed by the parties that the defendant should pay $20.00, or any other amount, per thousand for logs delivered to him by plaintiff, and when the court reduced the purchase price of the property it thereby made a new contract for the parties and one different from that agreed to by them.

■ Defendant further contends that there was a mutual mistake by plaintiff and defendant. He refers to the fact that plaintiff was mistaken as to the number of feet of logs on the premises and apparently, from his argument, he thinks that defendant made a mistake in relying upon plaintiff's representation as to the number of feet of logs. He seems to consider these mistakes as mutual, and sufficient to sustain the court's decree in reforming the contract. In 53 C. J., Reformation of Instruments, § 60 (b), p. 945, under the subject of what constitutes mutual mistake, is the following:

"Mutual mistake in relation to reformation means a mistake shared by both parties. It consists in a misunderstanding reciprocal and common to both the contracting parties, when each alike labored under the same misconception in respect to the terms of a written instrument, *intending at the time of the execution of the instrument to say one thing and by mistake expressing another*. The mistake cannot be mutual if the minds of the parties to the instrument did not meet in a common intent. By

mutuality is not meant that both parties must agree on the hearing that the mistake was in fact made, but the evidence of the mutuality of the mistake must relate to the time of the execution of the instrument, *and show that at that particular time the parties intended to say a certain thing and by mistake expressed another."* (Emphasis added.)

The rule enunciated in the foregoing excerpt finds support in the following: 45 Am. Jur., Reformation of Instruments, § 56, p. 618; 23 Harvard Law Review, 611; *Sheppard v. Koch,* 234 Ky. 1, 27 S. W. (2d) 389; *Matthews v. Whitethorn,* 220 Ill. 36, 77 N. E. 89; *Archer v. McClure,* 166 N. C. 140, 81 S. E. 1081, Ann. Cas. 1916 C, 180.

■ The purpose of reformation by a court of equity is to make an erroneous instrument express correctly the real agreement between the parties; no court can make a new contract for them. Where a written instrument is merely intended to record a prior, definite, and specific oral understanding of the parties, but, because of a mutual mistake, that instrument fails to set out the prior agreement correctly in some material respect, a court of equity will ordinarily reform it. In other words, in order for a written instrument to be reformed in equity, it is necessary that the parties thereto shall have previously reached a complete mutual understanding with respect to all of the essential terms of their agreement, for otherwise there would be no standard by which the writing could be reformed. "It is not enough to justify reformation that the court is satisfied that the parties would have come to a certain agreement had they been aware of the actual facts." 5 Williston on Contracts, Rev. Ed., § 1548, at p. 4341.

■ In the instant case the written instrument, sought

to be reformed, did not fail to express correctly the real agreement between the parties. There was no mutual mistake. The court therefore erred in reforming the agreement between the parties to the litigation. Our conclusion is not in conflict with *Howard v. Tettelbaum,* 61 Or. 144, 120 P. 373; 2 Pomeroy's Equity Jurisprudence, 3rd Ed., § 867, footnote 4, on p. 1533; 12 Am. Jur., § 126, pp. 618 and 619, cited and relied upon by defendant.

Other questions have been discussed in the briefs but in view of the decision reached it becomes unnecessary to express our views thereon. The only matter which has been decided in this case is that defendant is not entitled to reformation of the contract. The case has not been terminated. No final decree or judgment can be entered in this court on the record before us. It is the province of the trial court to direct the future course of this litigation.

The decree appealed from is reversed and the cause remanded for further proceedings not inconsistent with this opinion. Neither party to recover costs in this court.

PAGE, J., took no part in the consideration or decision of this case.