Argued May 2, reversed and remanded with directions June 7, petition for
rehearing denied June 28, 1977

# INTERIOR ELEVATOR COMPANY, *Appellant,*

## *v.*

# LIMMEROTH, *Respondent.*

## (TC 13544, SC P-2514)

565 P2d 1074

Donald F. Dunn, The Dalles, argued the cause for appellant. With him on the briefs were Phipps, Dunn & Mobley, The Dalles.

Ronald M. Somers, The Dalles, argued the cause and filed the brief for respondent.

Before Denecke, Chief Justice, and Howell, Bryson, Lent, Linde and Campbell, Justices.

CAMPBELL, J., Pro Tempore.

**CAMPBELL, J., Pro Tempore.**

Plaintiff elevator company filed an action at law against defendant wheat farmer for the breach of a written contract wherein the defendant agreed to sell and deliver wheat to the plaintiff.

The amended complaint alleged that the defendant refused to deliver 5,138 bushels of the contracted total of 125,801 bushels. The plaintiff asked for damages in the amount of $13,153.28 plus interest.

The defendant's answer alleged that the plaintiff and defendant "entered into an agreement whereby Defendant promised and agreed to sell to Plaintiff all of the wheat then stored in the Dufur Elevator in the names of Defendant and Defendant's son, Paul Limmeroth, and all of the wheat then stored on the farm of the Defendant at a price of $2.49 per bushel," and that defendant had delivered all of said grain, "consisting of 120,663 bushels, and there is nothing further to be done * * *."

By way of a separate answer and affirmative equitable defense the defendant set out that by virtue of mutual mistake the parties had obtained an incorrect volume of 125,801 bushels when there were only 120,663 bushels in storage. The defendant then prayed that the contract be rescinded and that the parties be returned to their status quo or, in the alternative, that the contract be reformed to strike "125,801 bushels" and insert therein the quantity of "120,663 bushels."

It was stipulated that both the legal and equitable issues could be tried by the court without a jury.

The trial court reformed the contract "to incorporate the amount of wheat to be delivered as 120,663 bushels." We review the equitable questions de novo. ORS 19.125(3).

The defendant had operated a wheat ranch in the Dufur area of Wasco County since 1946. The plaintiff bought grain from farmers and resold it to grain

dealers. It did not buy grain and speculate on it—the handling and storage of grain provided its chief source of income. The plaintiff made "back-to-back" transactions with the farmer and the grain dealer.[1] The plaintiff has an elevator and port facilities at the Port of The Dalles.

In September 1972, wheat was selling for approximately $2.25 per bushel. The defendant had in storage his 1969, 1970, 1971 and 1972 wheat crops. Most of defendant's grain was stored in numerous bins on the Limmeroth ranch. However, a part of the 1972 crops had been placed in storage at a commercial elevator in Dufur because the defendant had no other storage available on his ranch.

In late September 1972 the defendant contacted Frank Adams, the plaintiff's general manager. Defendant Limmeroth told Adams that he wanted to sell his wheat for $2.49 per bushel for delivery in May 1973. Defendant Limmeroth did not know the exact volume of his wheat so it was agreed that Adams should contact the Agricultural Stabilization and Conservation Service (ASCS) office. The reason the ASCS office was called was that the Commodity Credit Corporation through ASCS had loaned the defendant money on 90 percent of the volume of his ranch storage and 100 percent on the elevator storage in Dufur. Adams, in the presence of the defendant, called that office and was told by Eve Sharp that the defendant's total volume was 125,472 bushels: 6,776 bushels in the Dufur elevator and the balance, 118,696 bushels, on defendant's ranch.

At trial, Eve Sharp testified that all the volume figures she gave Adams on the telephone were at 100

---

[1]The plaintiff's general manager explained a "back-to-back" transaction:

"We must have a price from a grain buyer equal to the price we are offering to pay the grower and when the price is agreed and the customer wants to sell we buy it as an agent for the grower and resell it to the grain buyer at the same price."

percent, but she did not comment to that effect. Adams testified that he assumed that the ranch total was a 90 percent figure, but that he and the defendant did not discuss that question. Defendant Limmeroth testified that he too thought the ranch figure was at 90 percent of the total and further testified that he and Adams did discuss it.

In any event, Adams rounded the 118,696 bushel total of farm storage given him by Sharp up to 119,025, added the Dufur elevator wheat at 6,776 bushels, and arrived at an overall total of 125,801 bushels. Adams gave this overall total to defendant Limmeroth. Apparently, both plaintiff and defendant assumed that the 125,801 bushel figure was well within a margin for safety. Defendant Limmeroth testified that:

> "A  Well, he gave me a figure—now I don't remember the figures—and I told him that that sounded all right with me, that—and I always did go by 90%, like I say, and I thought I would have plenty of overrun * * *."

Apparently, Adams also explained to defendant Limmeroth the need for an exact number of bushels:

> "Q  Now, did you make any statement to Mr. Limmeroth about your need for definiteness on the bushels?
> "A  Yes, this was the reason for trying to get the figures since he did not have them on his person, to determine how many bushels were to be sold because the market was such that we needed to know exactly how many bushels were sold because we had to deliver the exact numbers that we purchased."

Limmeroth left Adams' office and several days later the plaintiff began offering the wheat for sale. On October 10 the plaintiff received an offer from Dreyfus in Portland to buy 125,000 bushels for $2.49. Adams called the Limmeroth ranch to see if the defendant still wanted to sell his wheat at that price. Defendant's wife assured Adams that the defendant still wanted to sell. Adams mailed to Limmeroth a document:

"INTERIOR ELEVATOR COMPANY, INC.
P. O. Box 640 - The Dalles, Oregon
[2]

DATE 10/10/72

TO PAUL AND AL LIMMEROTH
   DUFUR, OREGON

We confirm our purchase from you today * * * of the fol-
lowing grain:

QUANTITY       125,801 BUSHELS
COMMODITY      WHEAT
PRICE          $2.49
BASIS          #1 PORTLAND
DELIVERY       MAY, 1973
SUBJECT TO

REMARKS * * *

IT IS UNDERSTOOD THAT THIS CONFIRMATION AND ACCEPTANCE
WITHOUT NOTIFYING US OF ERROR HEREIN, IS ACKNOWLEDGMENT
OF CONTRACT AS ABOVE.

E. & O. E.                    INTERIOR ELEVATOR COMPANY
ACCEPTED /s/ Al Limmeroth    BY  /s/ Frank P. Adams"

---

[2]Paul Limmeroth is Al Limmeroth's son. Paul Limmeroth owned 16,788 bushels of the wheat. No question has been raised as to Al Limmeroth's authority to sell Paul's wheat. Paul is not a party to this case.

[ 594 ]

The foregoing document was signed by Al Limmeroth a few days after October 10 and returned to Frank P. Adams.

In February 1973 the defendant began delivering the wheat from his ranch and the Dufur elevator to the plaintiff's place of business in The Dalles. The last truckload was unloaded on June 13. The defendant had delivered to the plaintiff 120,663 bushels and therefore under the document of October 10 was short 5,138 bushels.

Between June 13 and September 6 there was much activity on the part of both parties to determine why there was a shortage of 5,138 bushels. The records of the ASCS, Commodity Credit Corporation and the plaintiff were checked and rechecked. The storage grain bins on the Limmeroth ranch were double-checked. No one at the trial offered a conclusive explanation of the shortage. Finally, on September 6 the defendant and his attorney visited the plaintiff's office and informed Adams that Limmeroth was not going to deliver any more wheat. The price of wheat on that date was $5.05 per bushel. The plaintiff covered the balance of its contract with Dreyfus with other wheat that cost it at least $5.05 per bushel but did not buy enough wheat to make up the entire contract amount.

The trial court in a written decision said:

"* * * This court places great significance on the facts that the figures which were inserted in the contract were obtained by Mr. Adams without a clear understanding of what they represented, and that he was the one who inserted the figures in the ultimate written confirmation. * * *

"* * * * *

"* * * [I]t is clear from the testimony that both parties intended that Limmeroth would sell all of his stored wheat to Interior. * * *"

Thus, that court reformed the instrument of October 10, 1972, to read "120,663 bushels." The trial court

never in its decision or findings directly classified the mistake as a "mutual mistake."

Assuming that this was mutual mistake, then the question becomes: Is this the type of mutual mistake for which a court of equity will grant reformation?

The ground rules for a reformation suit are set out in *Koennecke v. Waxwing Cedar Prod.,* 273 Or 639, 543 P2d 669 (1975):

> "The law entertains a presumption which favors the validity and correctness of written instruments. *Dolph v. Lennons, Inc., et al,* 109 Or 336, 355, 220 P 161 (1923); *L. B. Menefee Lumber Co. v. Gamble,* 119 Or 224, 233-34, 242 P 628 (1926). To obtain reformation, the evidence of mutual mistake must be clear, convincing and unambiguous. *Amato v. Amato's Supper Club, Inc.,* 269 Or 520, 524, 525 P2d 1023 (1974); *Mayer/Kleinknecht v. Bassett,* 263 Or 334, 348, 501 P2d 782 (1972). There must be proof of a valid antecedent agreement. *Moyer et ux v. Ramseyer et al,* 226 Or 122, 134-35, 359 P2d 407 (1961)." 273 Or at 643.

■ *Manning Lumber Co. v. Voget,* 188 Or 486, 216 P2d 674 (1950), set out the general principles for reformation based on mutual mistake:

> "The purpose of reformation by a court of equity is to make an erroneous instrument express correctly the real agreement between the parties; no court can make a new contract for them. Where a written instrument is merely intended to record a prior, definite, and specific oral understanding of the parties, but, because of a mutual mistake, that instrument fails to set out the prior agreement correctly in some material respect, a court of equity will ordinarily reform it. In other words, in order for a written instrument to be reformed in equity, it is necessary that the parties thereto shall have previously reached a complete mutual understanding with respect to all of the essential terms of their agreement, for otherwise there would be no standard by which the writing could be reformed. 'It is not enough to justify reformation that the court is satisfied that the parties would have come to a certain agreement had they been aware of the actual facts.' 5 Williston on Contracts, Rev. Ed., § 1548, at p. 4341." 188 Or at 500.

Thus, to warrant reformation for mutual mistake, the error must have been in the *drafting* of the instrument and not in the *making* of the contract. *See also Prueitt v. Sound Con. & Eng. Co.,* 178 Or 380, 391, 167 P2d 698 (1946).

This rule is clearly announced in 66 Am Jur 2d 539, Reformation of Instrument, § 13 (1973):

"* * * There must be an antecedent agreement which the written instrument evidences, and the mistake must have been in the drafting of the instrument, not in the making of the contract. An instrument will not be reformed on the ground of a mere misunderstanding of the facts, or a mistake as to an extrinsic fact which, if known, would probably have induced the making of a different contract or no contract at all. If there has been any misunderstanding between the parties, or a misapprehension by one or both, so that their minds have not met, no contract has been entered into, and the court will not make for them a contract which they did not make." (Footnotes omitted.)

*See also* 13 Williston, Contracts 134, § 1549 (3d ed 1970); 76 CJS 353, Reformation of Instruments § 26 (1952); and Restatement of Contracts § 504, comment *c* at 969 (1932).

■ The mutual mistake here occurred in late September when Adams received from Sharp the 100 percent volume figure of 125,472 and relayed it to Limmeroth. The 125,472 was a total of 118,696 bushels in ranch storage and 6,776 bushels in the Dufur elevator. The parties thought the ranch total was a 90 percent figure. 118,696 is 90 percent of 131,884. If the 6,776 bushels in commercial storage in Dufur are added to 131,884, the total becomes 138,660. The contract figure of 125,801 bushels is well within this assumed total of 138,660. Therefore, it is clear that when the figure of 125,801 bushels appeared in "confirmation of sale" it was not a drafting mistake. Adams put in the document the exact figures the parties had in mind at the time of their agreement.

The trial court reformed the confirmation agree-

ment to the number of bushels actually delivered, 120,633. This figure of 120,633 bushels was not known to anyone until the defendant's last truck was weighed[3] at the plaintiff's elevator on June 13, 1973, more than eight months after Limmeroth and Adams had negotiated the sale of the wheat.

It could be argued that the contract was for the sale of "all of the wheat owned and in storage by Limmeroth on October 10, 1972," and that the volume was merely descriptive and not controlling. This argument must fail on the facts in this case. It was the undisputed testimony of Adams that because of the nature of "back-to-back" sales, the plaintiff had to have a definite volume amount. Adams also testified that the grain companies, such as Dreyfus, would not accept "over and under" contracts.

The text writers and cases in dealing with the question of mutual mistake draw a distinction between the availability of the remedy of rescission and the remedy of reformation.

"In the case of a fundamental mistake relating to an essential element of the contract, which prevents a meeting of the minds of the parties, such mistakes generally having to do with such matters as the existence and identity of the subject matter or errors as to price, quantity, and the like, the remedy is not reformation, but rescission. * * *" 66 Am Jur 2d 539, § 14, n 33, citing *Harley v. Magnolia Petroleum Co.,* 378 Ill 19, 37 NE2d 760, 137 ALR 900 (1941).

3 Corbin, Contracts 728, § 614 (1960), demonstrates this distinction:

"If two parties are caused to enter into a contract by reason of their common ignorance or common mistake as to some fact, but for which they would have not agreed, this may be ground for rescission, but it is not ground for reformation. Proof of such a mistake as this does not show that the parties have ever expressed assent, orally or otherwise, to any contract other than the one that is

---

[3]The weight of the wheat at the elevator is converted into bushel volumes. The average bushel of wheat weighs approximately 60 pounds.

written. That writing truly expresses the only terms on which they have ever agreed. It may be subject to rescission for mistake; but there is no other agreement in accordance with which it can be 'reformed.' " (Footnote omitted.)

The leading case on the classification of mutual mistakes seems to be *Harley v. Magnolia Petroleum Co., supra*:

"Mistakes are generally divided into two groups, first, those fundamental in character, relating to an essential element of the contract which prevent a meeting of the minds of the parties and so no agreement is made. These generally have to do with such matters as the existence and identity of the subject matter, errors as to price, quantity, and the like. In the other class of mistakes an actual good-faith understanding is reached but through some error, not expressed, the agreement reduced to writing is not the actual agreement. The former of these classes constitutes ground for rescission but not reformation, while the latter may be reformed. * * *" 378 Ill at 28, 137 ALR at 906.

The mutual mistake of Limmeroth and Adams in arriving at the volume of 125,801 bushels is not the type of mistake for which the law will allow reformation.

■ The first prayer of the defendant's answer seeks "[a] decree rescinding said contract in its entirety and returning both parties to their status quo * * *." This case was tried in the trial court on the theory of reformation for mutual mistake and it was briefed and argued in this court on the same theory. It is too late at this stage of the case to consider rescinding the contract and "requiring Plaintiff to return all of said wheat delivered under said agreement, and requiring Defendant to return all sums of money received from Plaintiff for said wheat * * *."

Since defendant did not adequately show his right to reformation or rescission, we must look to the

[ 599 ]

validity of plaintiff's claim under the contract as written. The trial court's findings included:

> "That the Plaintiff proved a prima facie case and that if it were not for the equitable defense, the Plaintiffs would be entitled to a judgment in the amount of $11,102.72 plus interest from September 6, 1973, and their costs and disbursements. The Plaintiff's damages were computed by subtracting the amount of wheat which was delivered from the amount of wheat which was resold to Dreyfus, resulting in a figure of 4,337 bushels and multiplying that by $2.56 which was a difference between $2.49 a bushel and $5.05 a bushel."

Defendant has claimed no error in the making of this finding as it relates to the issue of liability and so it is conclusive on that question. The proper measure of damages, however, remains in dispute.

Since the contract called for 125,801 bushels, only 125,000 of which were to be sold to Dreyfus, the trial court's determination of damages did not allow recovery on 801 bushels. The trial court appears to have based its reasoning on the "cover" provisions of ORS 72.7120.[4] Plaintiff, however, did not seek damages under the "cover" provision but rather under ORS 72.7130,[5] which grants damages as the difference between the market price of the goods on the date of

---

[4] ORS 72.7120:

"(1) After a breach within ORS 72.7110 the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

"(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined in ORS 72.7150, but less expenses saved in consequence of the seller's breach.

"(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy."

[5] ORS 72.7130(1):

"Subject to the provisions of ORS 72.7230 with respect to proof of market price, the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in ORS 72.7150, but less expenses saved in consequence of the seller's breach."

breach and the contract price. Under this section plaintiff would be entitled to damages of $2.56 a bushel times the 5,138 bushels which were not delivered by defendant under the contract. This results in a figure of $13,153.28, which was the amount prayed for by plaintiff.[6]

Defendant contends that plaintiff elected its remedy at the time it purchased the additional wheat to fulfill its contract with Dreyfus and that since that constitutes "cover" under ORS 72.7120, plaintiff cannot now seek to recover damages under ORS 72.7130. Defendant relies upon White and Summers, Uniform Commercial Code 191, § 6-4 (1972), where Uniform Commercial Code § 2-713 (ORS 72.7130), comment 5, is quoted:

> "The present section provides a remedy which is completely alternative to cover under the preceding section and applies only when *and to the extent that* the buyer has not covered." (Emphasis added.)

However, the language emphasized in comment 5 above makes it clear that the drafters of the code contemplated situations in which buyers would only partially cover. This is precisely what occurred here. The plaintiff "covered" only enough to meet its contract obligation to Dreyfus. It would appear, therefore, that plaintiff would have been entitled to the actual cost of cover, if shown to be reasonable, plus damages measured under ORS 72.7130 as to the remaining 801 bushels. Plaintiff did not seek this remedy but rather sought to recover under ORS 72.7130 as to the entire amount of wheat that defendant failed to deliver. Since market price was less than the cost of cover, plaintiff is entitled to use this measure as to the wheat which was actually purchased. The fact that plaintiff did not cover the entire amount does not bar recovery under ORS 72.7130.[7] The trial court therefore was in

[6]This is the amount which the trial court found that plaintiff would be entitled to if damages were allowed under ORS 72.7130.

[7] *See* ORS 72.7120(3). Although failure to cover does not bar recovery of damages it may in some cases affect the consequential damages available. *See* comment 3 to § 12 of White and Summers, Uniform Commercial Code (1972).

error and should have granted plaintiff's prayer for $13,153.28, together with interest at the rate of 6 percent per annum from September 6, 1973.

Reversed and remanded for entry of judgment consistent with this opinion.