156 P.3d 97 (2007)
211 Or. App. 520
CENTRAL OREGON INDEPENDENT HEALTH SERVICES, INC., an Oregon corporation, Plaintiff-Appellant,
v.
STATE of Oregon, acting by and through the Department of Human Services, Office of Medical Assistance Programs, Defendant-Respondent.
02C17943; A127934.
Court of Appeals of Oregon.
Argued and Submitted August 4, 2006.
Decided March 28, 2007.
*98 William F. Gary, Eugene, argued the cause for appellant. With him on the briefs were Sharon A. Rudnick, Karla Alderman, and Harrang Long Gary Rudnick P.C., and Matthew G. Weber and Holland & Hart, LLP, Denver.
Paul L. Smith, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before LANDAU, Presiding Judge, and SCHUMAN, Judge, and LIPSCOMB, Judge pro tempore.
LANDAU, P.J.
This case involves a disagreement about the meaning of a series of complex contracts concerning the rates at which the state is obligated to reimburse health care services providers who provide services under the Oregon Health Plan. Pared to essentials, the disagreement amounts to a straightforward dispute about a potential conflict between two provisions in the contracts. On the one hand, the contracts provide that the specified reimbursement rates are calculated in accordance with a particular formula. On the other hand, the contracts state that those rates constitute the "total" or "maximum" rate of payment. The dispute arises out of the contentions of plaintiff, a health care *99 provider, that the state failed to calculate the reimbursement rates in accordance with the formula and that the rates should be higher than those specified in the contracts. The state responds that whether it complied with the formula is irrelevant, because the contracts establish the "total" or "maximum" reimbursement rates, and it is undisputed that it has reimbursed plaintiff at those rates.
Plaintiff initiated this action for breach of contract, promissory estoppel, and reformation. The trial court dismissed the latter two claims for failure to state a claim. The parties filed cross-motions for summary judgment on the remaining breach of contract claim. The trial court denied plaintiff's motion, granted the state's motion, and entered judgment accordingly.
On appeal, plaintiff assigns error to the trial court's decision to grant the state's summary judgment motion and to deny its own motion. Plaintiff also assigns error to the dismissal of its reformation claim. For the reasons that follow, we conclude that, although the trial court did not err in denying plaintiff's motion for summary judgment, it did err in granting the state's motion. We also conclude that the trial court erred in granting the state's motion to dismiss the reformation claim. We therefore reverse and remand.

I. BACKGROUND
We begin with a brief description of the regulatory backdrop against which the parties negotiated the agreements at issue. We then describe the provisions of the agreements that are in dispute, before turning to the specific events that led to the initiation of this action and the judgment that is the subject of the appeal.
A. The Oregon Medical Assistance Program
Congress created the Medicaid program to provide basic health care services to individuals of limited means. 42 U.S.C. § 1396. The program is jointly administered by federal and state governments; that is, it is funded by both federal and state governments but is managed by the states, subject to the requirements of federal law. Under that federal law, states may serve Medicaid recipients by, among other things, using a network of "fee-for-service" providers that are reimbursed for the actual costs of providing services or by using managed health care organizations (MCOs) that are reimbursed on the basis of a predetermined per capita patient basis, also known as a "capitation" basis.
The basic idea of capitation payments is to allocate risk in a way that creates incentives for health care services providers to provide those services in an efficient manner. The rates are calculated by means of various actuarial assumptions and formulae designed to predict the likely actual cost of providing the services. If the providers can provide the services at a cost less than the projected rates, the providers are entitled to "keep the difference" as a reward for their efficiencies. If the providers cannot do so, however, their reimbursement remains at the predetermined rate. The providers are barred from seeking retroactive payment beyond the predetermined capitation rate.
Oregon's Medicaid program is known as the Oregon Health Plan (OHP), see ORS 414.019 (listing laws comprising the OHP) and is administered by the Oregon Medical Assistance Program (OMAP). By law, OMAP is required to serve Medicaid-eligible individuals "to the greatest extent possible" through MCOs on a prepaid capitation basis. ORS 414.725. OMAP does just that through the use of capitation contracts with health care services providers in particular geographic areas. In those contracts, the providers agree to provide medically appropriate services to OHP participants within a specified geographic area. In exchange, OMAP agrees to reimburse the providers in accordance with a specified capitation paymenta specific monthly per-person rate for different classes of participants.
B. The contracts
Plaintiff is a health care services provider certified by OMAP to provide services to OHP participants. Beginning in 1997, plaintiff and OMAP entered into a series of annual "Fully Capitated Health Plan Agreements" *100 to provide services to OHP participants in central Oregon. Five of those contractsfor the years 1997 to 2001are at issue in this case. The material provisions of each contract are substantially similar.
Each contract contains a "consideration" section. The contract for fiscal year 1997, for example, provides:
"A. In consideration of all work to be performed by Contractor under this Agreement, OMAP shall pay Contractor:
"(1) A Capitation Payment for each OMAP Member, beginning with the date of enrollment and ending with the date of disenrollment. Contractor shall be paid a capitation only for those OMAP Members who are enrolled with Contractor according to OMAP records. Where the date of enrollment is during mid-month, the Capitation Payments shall be prorated."
There follows at that point a listing of capitation rates for 14 categories of OMAP members. For example, the rates for the Grant County service area are listed as follows:
"$121.35 for Aid to Families with Dependent Children (AFDC)
"$431.76 for General Assistance (GA)
"$544.18 for PLM [Poverty Level Medical] Adults under 100% Federal Poverty Level
"$653.91 for PLM Adults over 100% Federal Poverty Level
"$ 86.90 for PLM Children under 100% Federal Poverty Level
"$122.79 for PLM Children over 100% Federal Poverty Level
"$97.01 for OHP Families
"$104.97 for OHP Adults and Couples
"$449.15 for AB/AD without Medicare
"$184.12 for AB/AD with Medicare
"$187.35 for QAA with Medicare Part B only
"$161.22 for OAA with Medicare
"$422.85 OAA without Medicare
"$127.02 for SOSCF Children"
The rates for seven other counties follow those listed for Grant County.
At that point, the consideration section of the 1997 agreement declares that "[t]he above Capitation Payments are calculated according to EXHIBIT B, Calculation of Capitation Payments, which is attached hereto and by this reference incorporated herein." Exhibit B, in turn, sets out in detail the actuarial assumptions on which the "above rates" are calculated. It explains, among other things, the derivations of per capita costs from claims experience data with commercially insured populations in Oregon and from actual charges for Medicaid recipients in the state. And it incorporates by reference even more detailed descriptions of methodology, actuarial assumptions, data tables, and the like in a report prepared by a consulting accounting firm.
Finally, the consideration section of the 1997 contract declares that "[t]he consideration listed in Section A above is the total consideration payable to Contractor for all work under this Agreement" and that those amounts "may be changed by amendment to this Agreement" pursuant to provisions governing the amendment process that permit such changes only when reduced to writing and approved by the parties.
The contracts for the succeeding four years also contain consideration sections that are substantially similar to those in the 1997 agreement. Each provides that the capitation payments "are calculated according to EXHIBIT B." Unlike the 1997 agreement, however, the subsequent agreements do not list the capitation payment rates in the text of the consideration section and instead specify the rates in a separate document that is attached and incorporated by reference. The specific capitation rates themselves also vary from year to year as OMAP recalculated them in accordance with changes in the relevant data.
Each of the subsequent agreements also provides that the specified capitation rates constitute the total consideration that OMAP may pay to plaintiff. The wording varies slightly. The contracts for the years 1998 and 1999 parrot the wording of the 1997 contract in declaring that the specified capitation rates constitute "the total consideration payable" under the contracts, while the later agreements declare that the specified capitation rates constitute "the maximum *101 rate[s] authorized to be payable." And each of the later agreements provides that the rates may be altered by the amendment process set out elsewhere, requiring written notification and approval by the parties.
C. The dispute
Plaintiff provided services as required under the contracts. OMAP, in turn, paid plaintiff in strict accordance with the capitation rates spelled out in each of those agreements. During the course of performance of the contracts, OMAP discovered a number of errors in its calculation of reimbursement rates. OMAP and plaintiff agreed to correct those errors by amending the contracts.
At some point, however, plaintiff identified what it believed to be other errors in the calculation of the rates. Plaintiff ultimately concluded that those calculation errors resulted in underpayments of as much as $34 million over the course of the 1997-2001 contract periods. OMAP refused to adjust its previously made capitation payments. It insisted that it had been paying precisely the capitation payments specified in the agreements for each of the contract periods and that the contracts specifically provided that, in the absence of written amendments, those capitation rates constituted the "total" or "maximum" rates that it was authorized to pay.
Plaintiff then initiated this action against the state. As amended, the complaint alleges two claims for breach of contract as well as claims for promissory estoppel, and reformation. The first breach of contract claim is predicated on the contention that OMAP miscalculated the capitation rates in violation of a contractual obligation to calculate the rates in accordance with the formulae set out in Exhibit B to each of the five annual agreements. The second breach of contract claim is based on the contention that OMAP acted in bad faith in failing to correct the erroneous calculations. The promissory estoppel claim is based on allegations that plaintiff reasonably relied on OMAP's representations that the capitation rates would be correctly calculated and, as a result, has suffered the detriment of being deprived of the full capitation rates to which it was entitled. The reformation claim is based on the allegation that "either (a) the parties were mutually mistaken as to the rate of payment or (b) [plaintiff] was mistaken as to the rate of payment and OMAP was aware of this mistake but inequitably failed to disclose the mistake."
The state moved to dismiss the complaint in its entirety. The trial court granted the motion as to the claims for promissory estoppel and reformation. The state then moved for summary judgment on the remaining breach of contract claims. Concerning the first of the two contract claims, the state argued that each of the contracts unambiguously provided that OMAP was obligated to pay no more than the capitation rates that were specified in the contracts themselves. As for the second contract claim, the state argued that plaintiff's claims of bad faith concerned the formation of the terms of the contract, not a failure to perform those terms in good faith. Plaintiff filed a cross-motion for "partial summary judgment on contract interpretation" on the ground that the contracts unambiguously obligated OMAP to pay rates in accordance with the formulae set out in the various versions of Exhibit B appended to the contracts. The trial court granted the state's motion and denied plaintiff's.

II. ANALYSIS
On appeal, plaintiff assigns error to the trial court's disposition of the summary judgment motions and to the dismissal of the reformation claim. We address those assignments in turn.
A. Summary judgment on the contract claims
Plaintiff first challenges the trial court's rulings on the parties' summary judgment motions. According to plaintiff, the trial court should have denied the state's motion and granted its own motion on the ground that each of the annual contracts expressly and unambiguously obligated OMAP to calculate the capitation rates in accordance with the formulae set forth in Exhibit B. Plaintiff contends that there are "unmistakable mathematical *102 and mechanical errors" in OMAP's calculation of the rates in each of the contracts that resulted in a total underpayment in excess of $34 million. Plaintiff further asserts that uncontradicted evidence demonstrates that OMAP deliberately avoided learning of the mistakes and, each year, when it recalculated the capitation rates for a new contract, it avoided correcting those mistakes.
The state contends that the trial court correctly granted its motion and denied plaintiff's. The state begins by taking issue with plaintiff's contention that the provisions in the contracts that refer to the calculation of capitation rates express an obligation of performance. The state points out that, by the time of execution of each of the contracts, OMAP had already calculated the capitation rates and expressly listed them in the terms of the contract. The portion of the contract on which plaintiff relies for its claims, the state contends, constitutes a recital of how the rates were calculated, not a promise about any obligation that OMAP had in the future. Confirming that reading of the contracts, the state argues, is the fact that each of them expressly declares that OMAP is without authority to pay any more than the capitation rates specified in those contracts. According to the state, plaintiff's reading of the agreement would deprive those provisions of their plainly intended effect.
We begin by noting that, although the denial of a motion for summary judgment generally is not reviewable, in an appeal from a final judgment entered after the granting of summary judgment, the court will review the trial court's denial of a cross-motion for summary judgment. To v. State Farm Mutual Ins., 319 Or. 93, 873 P.2d 1072 (1994). In reviewing the trial court's decision on each motion, we review the record in the light most favorable to the party opposing it, Eden Gate, Inc. v. D&L Excavating Trucking, Inc., 178 Or.App. 610, 622, 37 P.3d 233 (2002), to determine whether there are any disputed issues of material fact and whether either party was entitled to judgment as a matter of law. ORCP 47 C; Jones v. General Motors Corp., 325 Or. 404, 407, 939 P.2d 608 (1997).
A party is entitled to summary judgment on a contract dispute only if the governing terms of the contract are unambiguous. Milne v. Milne Construction, 207 Or.App. 382, 142 P.3d 475, rev. den., 342 Or. 253, 149 P.3d 1212 (2006). Whether a contract is ambiguous is a question of law. Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997). A contract provision is ambiguous if, when examined in the context of the contract as a whole and the circumstances of contract formation, it is capable of more than one plausible and reasonable interpretation. Batzer Construction, Inc. v. Boyer, 204 Or. App. 309, 313, 129 P.3d 773, rev den, 341 Or. 366, 143 P.3d 239 (2006).
It bears some emphasisbecause of the applicability of the point to this case that "[t]he threshold to show ambiguity is not high." Milne, 207 Or.App. at 388, 142 P.3d 475. Generally, disposition of a contract dispute as a matter of law is not appropriate unless the meaning of the disputed provisions "is so clear as to preclude doubt by a reasonable person." Deerfield Commodities v. Nerco, Inc., 72 Or.App. 305, 317, 696 P.2d 1096, rev. den., 299 Or. 314, 702 P.2d 1111 (1985).
In this case, the issue is whether the annual capitation contracts between plaintiff and OMAP unambiguously require OMAP to reimburse plaintiff at rates other than those specified in those contracts. Plaintiff argues that the contracts do unambiguously require that because, in plaintiff's view, they require OMAP to calculate the capitation rates in accordance with the formulae set out in Exhibit B to each of the contracts. The state argues that the contracts expressly and unambiguously preclude OMAP from paying plaintiff more. We conclude that, when viewing all of the relevant provisions of the contracts, neither construction is "so clear as to preclude doubt by a reasonable person." Deerfield Commodities, Ltd., 72 Or.App. at 317, 696 P.2d 1096.
We begin with the observation that the state's construction of the agreements is a plausible one. The consideration provisions of each of the contracts specify the reimbursement ratesliterally, to the penny that OMAP is obligated to pay for some 14 *103 categories of patients in each of seven counties. The rate for General Assistance patients in Grant County, for example, is $431.76 per patient per month, while the rate for Oregon Health Plan families is $97.01.
Thus, as of the time of execution of the contracts, those reimbursement rates already had been calculated. After listing each of the capitation rates applicable to each category of patient in each county, the agreements state that "[t]he above Capitation Payments are calculated" in accordance with the attached exhibit detailing the actuarial and other assumptions and data inputs that produced them. In that context, it is reasonable for the state to contend that the foregoing statement is not a promise about how the rates will be calculated and that, instead, the statement merely describes the method by which OMAP arrived at the rates listed in the contracts. It is, in other words, a description of the factual and methodological predicate for a past event, viz., the calculation of the capitation rates.
Confirming the reasonableness of that construction is the fact that, after listing the specific rates and explaining the methods by which the rates were calculated, each of the contracts declares that those rates are either "the total consideration payable" or, in the case of the more recent contracts, "the maximum rate[s] authorized to be payable" under the agreements. The consideration provisions in each of the contracts then conclude with the declaration that the capitation rates "may be changed only by amendment" in accordance with the amendment provisions requiring mutual agreement and execution in writing. Thus, it is at least reasonable to construe the contract to provide that the specific capitation rates set out in the contracts are the maximum rates payable under those contracts and thateven if those rates were not correctly calculatedno additional payments are authorized in the absence of amendments negotiated by the parties.
The foregoing construction of the contracts, however, is not the only plausible one. Plaintiff suggests a contrary reading, one that is at least arguably consistent with the same provisions. As plaintiff correctly observes, although the contracts do set out specific capitation rates, each of the contracts expressly provides that those rates "are calculated" in accordance with Exhibit B, the formulae and actuarial assumptions that are required by law to be the basis for the reimbursement of services provided under the Oregon Health Plan.
Although the state may be correct that the representations may plausibly be regarded as recitals of past acts that is, how the rates were calculatedit is also at least plausible to read them as a representation as to the correctness of the calculations; the phrasing, after all, is not actually in the past tense but in the present progressive, connoting ongoing activitythat is, how the rates are being calculated. Particularly in the light of the fact that it is undisputed that plaintiff lacked the information on which to judge the correctness of OMAP's calculations at the time of contract formation, it is at least reasonable to construe the contracts to include assurances that the rates not just were, but are and continue to be, calculated in accordance with the method and assumptions set out in Exhibit B.
Consistent with that reading of the contracts is the fact that, when OMAP was confronted with errors in rate calculations in the past, it agreed to amendments to alter the rates to conform to the requirements of Exhibit B. As plaintiff properly observes, although it may have been the case that OMAP did so out of generosity, it is at least plausible to infer that it did so because it recognized a contractual obligation to ensure that the capitation rates were correctly calculated.
The state insists that plaintiff's reading of the contracts founders against the provisions that declare that the specified capitation rates are the "maximum" or "total" that OMAP is authorized to pay. That is so, however, only if it is assumed that there is no obligation to correctly calculate the capitation rates in the first place. It is at least reasonably possible to construe those maximum or total rate provisions to declare that the rates that are correctly calculated in accordance with Exhibit Bas the other contract provisions expressly warrantare the maximum or total that OMAP is authorized to pay.
*104 Both parties' proposed constructions of the contracts are plausible. Both are at least tenable in light of the wording of the agreements and the circumstances surrounding their formation. Neither, however, is so clearly the one intended by the parties as to preclude doubt by a reasonable person. The agreements, in short, are ambiguous, and the trial court erred in reaching a contrary conclusion.
Because we have determined that the trial court erred in concluding that the contracts were unambiguous, it necessarily follows that the trial court correctly denied plaintiff's summary judgment motion. It also follows, however, that the trial court erred in granting the state's motion with respect to the breach of contract claims. That is true of both breach of contract claims, as the court's decision with respect to each was predicated on its determination that the contracts unambiguously did not obligate OMAP to correctly calculate the capitation rates.
Plaintiff argues that, if we conclude that the agreements are ambiguous, we should proceed to determine their meaning, based on the undisputed facts in the summary judgment record. We decline to do that. It is not entirely clear to us that the facts are indeed undisputed. In any event, the trial court did not address that issue, having rested its decision on the ground that the contracts are unambiguous as a matter of law. See Anderson v. Carden, 146 Or.App. 675, 689, 934 P.2d 562, rev den, 326 Or. 68, 950 P.2d 892 (1997) (declining to address on appeal whether summary judgment was proper on an alternative ground when trial court expressly refrained from considering the alternative ground).
B. Dismissal of the reformation claim
Plaintiff also assigns error to the trial court's dismissal of the reformation claim under ORCP 21 A(8). According to plaintiff, the allegations in the complaint, while concededly meager, are nevertheless sufficient to withstand a motion to dismiss. The state responds that the allegations of the complaint are legally insufficient in two respects. First, the state argues, there is no allegation of an antecedent agreement to which the capitation contracts could be reformed. Second, there is no allegation that plaintiff's mistaken understanding was not the product of its own gross negligence.
We review the trial court's ruling on the motion to dismiss for errors of law. Yanney v. Koehler, 147 Or.App. 269, 272, 935 P.2d 1235, rev. den., 325 Or. 368, 939 P.2d 45 (1997). In determining whether plaintiff stated a claim, we accept as true all well-pleaded allegations, giving plaintiff the benefit of all reasonable inferences that may be drawn from those allegations. Scovill v. City of Astoria, 324 Or. 159, 164, 921 P.2d 1312 (1996).
To be entitled to reformation, a party must prove, by clear and convincing evidence,
"(1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence."
Jensen v. Miller, 280 Or. 225, 228-29, 570 P2d 375 (1977). We begin with the state's argument that plaintiff has failed to plead adequately an antecedent agreement.
In Manning Lumber Co. v. Voget, 188 Or. 486, 500, 216 P.2d 674 (1950), the Supreme Court explained that, where a written agreement "fails to set out [a] prior agreement correctly in some material respect, a court of equity will ordinarily reform it." The question is whether there was such an agreement, that is, something to which "the subsequent written document can be made to conform." Frick v. Hoag, 277 Or. 135, 138, 559 P.2d 879 (1977). The antecedent agreement itself need not "be complete and certain enough to be a contract" by itself. Pioneer Resources, LLC v. D.R. Johnson Lumber Co., 187 Or.App. 341, 367-68, 68 P.3d 233, rev. den., 336 Or. 16, 77 P.3d 319 (2003). In appropriate circumstances, a single term can constitute the operative antecedent agreement. Id.
*105 In this case, plaintiff has alleged that, if the contracts are construed to impose no obligation on OMAP to correct erroneously calculated capitation rates, then the contracts no longer reflect what the parties originally agreed to. According to the allegations of the complaint, whatever the written contracts state, the parties originally intended that OMAP would be obligated to pay at the correctly calculated rates in accordance with Exhibit B. Consequently, the complaint states, the contracts must be reformed to reflect "the parties' antecedent understanding, based on the requirements of federal and state law, that Rate Schedules were to be set in an actuarily sound manner."
Thus, the complaint alleges the existence of an antecedent agreement that is not accurately reflected in the written contract. That is what the law requires. The state's argument to the contrary is that the complaint needs to allege more specifically the details of the antecedent agreement. According to the state, the complaint should have alleged when the antecedent agreement occurred and what its precise terms were. Those details, however, are matters of proof, not pleading.
We turn to the question whether the complaint adequately alleged a lack of gross negligence. There is no question but that the complaint fails to allege an absence of gross negligence. It is often stated that an absence of gross negligence must be proved to establish the grounds for reformation of a contract. See, e.g., Jensen, 280 Or. at 229, 570 P.2d 375. Nevertheless, it has also long been the law of this state that it is not necessary, as a matter of pleading, to allege the negative in the complaint. As the court explained in Wolfgang v. Henry Thiele Catering Co., 128 Or. 433, 454, 275 P. 33 (1929), "it is unnecessary to negative gross negligence in ritualistic form." In the absence of an imputation of negligence, the court commented, "there can exist no necessity for requiring the pleader to negative it." Id. In this case, the state does not argue that plaintiff is obliged to allege an absence of gross negligence because its possible negligence has been put in issue. Instead, the state contends that the complaint is legally deficient solely because an allegation of an absence of gross negligence is a necessary element in all reformation cases. That is incorrect. We conclude therefore that the trial court erred in dismissing plaintiff's reformation claim.
Reversed and remanded.