Argued and submitted June 27, 2005, reversed and remanded August 23, petition for review denied December 19, 2006 (342 Or 253)

James C. MILNE,
an individual,
*Appellant,*

*v.*

MILNE CONSTRUCTION COMPANY,
a Louisiana corporation,
and Louis A. Bortolin,
an individual,
*Respondents.*

0306-06303; A125253

142 P3d 475

Mario Madden argued the cause for appellant. On the briefs were John G. Crawford, Jr., and David G. Fagan.

Eli D. Stutsman argued the cause for respondents. With him on the joint brief were Eli D. Stutsman A Professional Corporation and James E. Bartels and Meyer & Wyse LLP.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Armstrong, Judge.

ARMSTRONG, J.

---

* Brewer, C. J., *vice* Richardson, S. J.

**ARMSTRONG, J.**

Plaintiff appeals a judgment for defendants in a contract action. He assigns error to the trial court's grant of summary judgment to defendants based on its conclusion that the parties' contract was unambiguous. We conclude that the disputed contract term is ambiguous and that there is a genuine issue of material fact about its meaning. Hence, the trial court erred in granting summary judgment to defendants. We reverse.

In an appeal of a summary judgment, we review the facts in the light most favorable to the nonmoving party to determine whether the moving party is entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 407, 939 P2d 608 (1997). Plaintiff founded Milne Construction Company (MCC), now a corporation, in about 1953. From 1964, MCC's headquarters were at 1312 S.W. 16th Avenue, Portland, an office building that plaintiff owned. Although MCC had Canadian and Australian subsidiaries, plaintiff has always worked out of the 16th Avenue building. MCC was the sole commercial occupant of the building, which displayed the company name. In 1990, plaintiff contracted to implement his retirement plan by selling MCC to a Canadian employee, Louis Bortolin, one of the defendants here.[1] The contract valued MCC's stock at $3.9 million. Bortolin was required to buy specific amounts of stock annually and had an option exercisable from 1998 to 2001 to buy all of the stock. Although the contract contemplated complete transfer of the ownership of MCC to Bortolin, it was silent on conditions for MCC's future occupancy of 1312 S.W. 16th Avenue. By December 1997, when Bortolin owned 11 percent of MCC, he told plaintiff that he would leave the company if the purchase price was not reduced to reflect MCC's poor performance in several contract years. In response, the parties agreed to include in the sale the Australian subsidiary that plaintiff had planned to sell separately and to lower the sale price to $2.2 million. A

---

[1] Plaintiff has sued MCC and Bortolin, now president of MCC. To clearly present the facts, we refer by proper name to Bortolin and to MCC. Where we use the term "defendants" in the opinion, we refer to both Bortolin and MCC.

lawyer acting for all the principals to the transaction, that is, Bortolin, plaintiff, and the corporations, drafted a contract amendment. Dorothy Kight, an MCC vice president, typed revisions as the parties negotiated the amendment.

On December 16, 1997, plaintiff faxed a revised draft to Kight from a New York hotel. His revisions included proposed additional paragraphs 13, 14, and 15. Paragraph 13 was handwritten entirely in printed capital letters and read:

"AS PART OF AGREEMENT TO REDUCTION OF PURCHASE AND REDEMPTION FROM [$]3,900,000 TO [$]2,203,500, I.E., [$]1,6965,000 [sic], IT IS AGREED J.C. MILNE SHALL HAVE AVAILABLE AT NO CHARGE PERSONAL OFFICE SPACE FOR HIM AND SECRETAR-IAL SERVICE WITH PARKING IN MILNE CONSTR OFFICE AT HIS OPTION AT NO CHARGE [sic] UNTIL RETAINED EARNINGS HAVE INCREASED BY [$]1,696,500 OVER DEC. 31 RETAINED EARNINGS."

Kight was upset about plaintiff's last minute edits.[2] Into the following day, she conferred with the lawyer, and they decided to return a new draft to plaintiff with paragraphs 13, 14, and 15 typed in but lined out on the ground that,

"we, speaking from Lou [Bortolin]'s standpoint and from Milne Construction's standpoint, as a party to the contract 'We don't like any of these changes. This is the way we'd like to have it.' "

Kight also annotated the resulting draft to record that it was "as approved by LB." Plaintiff's receipt of a draft with his changes lined out precipitated an acrimonious phone call between Kight and plaintiff on December 17. Based on that phone call, Kight concluded that rejecting plaintiff's proposed paragraphs 13, 14, and 15 would be a deal breaker.

---

[2] Kight's account comes from her deposition and documents submitted in affidavits of defendants' and plaintiff's attorneys in connection with defendants' summary judgment motion. Defendants moved to strike portions of Kight's deposition and certain documents as "subjective musings," irrelevant, or lacking foundation. The trial court ruled after it granted defendants' summary judgment motion that the motion to strike was moot, and defendants do not challenge that ruling on appeal. Accordingly, the trial court's ruling leaves the materials in the record for our consideration.

Later that evening, Kight faxed to Bortolin at his Milne Canada office a memorandum about her phone call with plaintiff. The opening words of her memorandum were:

"I just got off a 1-1/2 hour phone conversation with [plaintiff]. After a lot of unpleasantness, * * * I told him that I definitely had the impression that he didn't want to let go and that was why he included the paragraph about having the office here. He assured me that he did want to sell and that if he had an office in this building, he would be completely separate from the operations of the Milne Company, even if policies were changed to policies that he didn't like. Basically, I think that he is used to coming here, is comfortable here, and will need someplace to go. He said several times that he wouldn't interfere and wouldn't suck up my time on his personal business. Based on this conversation, although I'm still not really happy with the idea, I could deal with it. It appears that his tying in the office space with 'recouping the $1.6 million lost' is just an example of his normal nasty sarcasm."

In concluding the memorandum, Kight wrote:

"Anyway, if the office thing is the only real sticking point, I don't want to cause any problems. As I said above, I can live with it. * * *

"After our conversation, I had the impression that he basically does want to sell the company to you and does want to get out. A part of him doesn't want to let go, but I think it is a smaller part than I would have thought previously.

"If you think you can deal with him as he is, * * * [b]asically, it's a good deal, and if the buyout can occur as soon as possible, you will be able to do things your way in the relatively near future."

According to Kight's deposition, at the time of these events, she thought that plaintiff's proposed paragraph 13 referred to the 16th Avenue building, because she and plaintiff had always worked for MCC at that location and moving MCC did not occur to her. She recalls that plaintiff's proposed paragraphs 13, 14, and 15 were the only issues remaining open. Negotiations then concluded quickly based on phone calls, of which there are no details in the record, between Bortolin in Canada and plaintiff in New York. On December

19, plaintiff, Bortolin, MCC, and Milne Construction (Australia) PTY Ltd. executed the contract revision, including a set of paragraphs numbered 13, 14, and 15. The now-disputed final paragraph 13 provides:

> "13.   It is agreed that [plaintiff] shall have available, at no charge, personal office space and secretarial services in the Milne Construction Co. Office, with parking, at his option."[3]

In December 1998, the parties completed the sale of MCC to Bortolin under the 1990 contract as amended, and MCC and plaintiff thereafter co-occupied the 16th Avenue building for more than four years. MCC had a month-to-month tenancy. Plaintiff retired upon his sale of MCC, but he continued to go to the office regularly to work on interests and affairs that he developed after selling the company. In accord with the dictates of paragraph 13, MCC made personal office space, parking, and secretarial services available to plaintiff at no cost.

In 2003, MCC moved its Portland operations to S.W. Macadam Avenue and discontinued providing plaintiff's office space, parking, and secretarial services at the 16th Avenue building by refusing to reimburse him for their cost. Instead, MCC offered plaintiff replacement accouterments and services at its new location. Plaintiff brought this action, contending that the commitment in paragraph 13 to provide

---

[3] Defendants made some attempt in the record to suggest that the clause, "at his option," refers only to parking services. We draw the inference favorable to plaintiff that he meant a unilateral right to the full complement of services, in part based on the structure of the original language in plaintiff's draft, where the phrasing is "PERSONAL OFFICE SPACE FOR HIM AND SECRETARIAL SERVICE WITH PARKING IN MILNE CONSTR[UCTION] OFFICE *AT HIS OPTION* AT NO CHARGE." (Emphasis added.) In the draft, "at his option" modifies the entire clause, "office space * * * in Milne Construction Office," by the doctrine of the last antecedent as an aid to discovery of meaning.

Analysis of the final paragraph 13 by the doctrine of the last antecedent also supports this inference. By the basic doctrine, "a proviso usually is construed to apply to the provision or clause immediately preceding it," but the rule as it is expanded to account for commas states that "[e]vidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma." *State v. Webb*, 324 Or 380, 386-87, 927 P2d 79 (1996) (quoting Norman J. Singer, 2A Sutherland Statutory Construction § 47.33, at 270 (5th ed 1992) (footnotes omitted)). In the final paragraph 13, "at his option" is separated from a group of antecedents by a comma.

him with "personal office space and secretarial services in the Milne Construction Co. Office, with parking, at his option" requires defendants to maintain his office space and services in the 16th Avenue building. In response, defendants claim that they are merely obligated to provide an office, parking, and secretarial support wherever MCC decides to locate its offices.

■      The trial court granted summary judgment to defendants because it concluded that the phrase, "the Milne Construction Co. Office," is unambiguous and means an office at which MCC chooses to conducts its business. The court stated that the parol evidence rule prevented consideration of any extrinsic evidence. On appeal, plaintiff renews his argument that his interpretation of paragraph 13 is plausible and, as a matter of law, establishes an ambiguity that presents a triable issue of material fact. Plaintiff argues that the trial court should have considered parol or other extrinsic evidence, including the circumstances underlying the formation of the contract, to identify the ambiguity. Defendants argue that the trial court correctly granted summary judgment because the court may only construe the contract within its four corners, and that defendants' interpretation of the disputed term is the only plausible interpretation.

■      In a contract dispute, a party will be entitled to summary judgment only if the governing terms of the contract are unambiguous. *Hauge v. Vanderhave*, 121 Or App 221, 225, 854 P2d 1002, *rev den*, 317 Or 583 (1993). We review for legal error a ruling that contract language is unambiguous. *Id*. The threshold to show ambiguity is not high. A contract provision is ambiguous if it has no definite significance or is capable of more than one plausible—that is, sensible and reasonable—interpretation. *Deerfield Commodities v. Nerco, Inc.*, 72 Or App 305, 317, 696 P2d 1096, *rev den*, 299 Or 314 (1985).

> "In determining whether a contract is ambiguous, parol evidence is admissible to explain the circumstances under which it was made. Although the evidence may not vary the terms of the written agreement, it can place the judge 'in the position of those whose language is being interpreted.' "

*Id.* at 317 (citations omitted); *see also Abercrombie v. Hayden Corp.*, 320 Or 279, 292, 883 P2d 845 (1994) (interpreting ORS 42.220[4] and ORS 41.740[5]); *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 129 P3d 773 (2006) (explaining that the rule from *Abercrombie*, that circumstances may be considered to determine whether a term is ambiguous, has not been overruled or modified by the legislature). We interpret the agreement as a whole, not word by word or sentence by sentence. *Deerfield*, 72 Or App at 319. In summary, for a term to be legally ambiguous, it must be susceptible to two plausible interpretations when examined in the context of the contract as a whole and the circumstances of contract formation, such as communications and overt acts. *Slocum v. Lang*, 132 Or App 571, 576, 889 P2d 379 (1995). The meaning of an ambiguous contract term is a question of fact. *Hauge*, 121 Or App at 224.

Based on our review of the circumstances of contract formation in the record, we hold that the trial court erred in granting summary judgment because the disputed paragraph 13 is ambiguous. The trial court misinterpreted the limitations of Oregon's parol evidence rule and thus failed to give due consideration to the plausibility of plaintiff's interpretation. As we have noted, "the trial court can properly consider the text of the provision in the context of the agreement as a whole and in light of the circumstances underlying the formation of the contract." *Batzer*, 204 Or App at 317. Evidence of the purpose of the 1990 contract and its amendment, and of the positions, conduct, and other circumstances of the parties during contract formation is sufficient to show that

---

[4] ORS 42.220 provides:

"In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting."

[5] ORS 41.740, which codifies Oregon's parol evidence rule, provides, in part:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing * * *. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220[.]"

plaintiff's interpretation of "the Milne Construction Co. Office" is plausible and thus renders the disputed contract term ambiguous.

First, we cannot presume that "Office" has a generic meaning in the contract merely because it is a simple, commonplace word. A review of Oregon case law involving contract interpretation shows that we have often concluded that a commonplace word or phrase is ambiguous in context. *See, e.g., Arlington Ed. Assn. v. Arlington Sch. Dist. No. 3*, 196 Or App 586, 103 P3d 1138 (2004) ("the grievance procedure" created ambiguity where two procedures possibly existed); *Western Surety Co. v. FDS Diving Construction*, 193 Or App 1, 88 P3d 293 (2004) (form document was ambiguous where a party did not fill in the line that instructed, "if none, so state"); *Yogman v. Parrott*, 325 Or 358, 362-63, 937 P2d 1019 (1997) ("residential purposes" and "commercial enterprise" are ambiguous given nature of actual use of the facilities); *Moon v. Moon*, 140 Or App 402, 914 P2d 1133, *rev den*, 323 Or 484 (1996) (in property settlement, "located at" was ambiguous phrase concerning a lot that had a separate tax ID number but no separate address from adjacent property); *Rodway v. Arrow Light Truck Parts*, 96 Or App 232, 236, 772 P2d 1349 (1989) ("officer" and "director" were ambiguous terms that could plausibly include a person about to become an officer or director).

We start our analysis with the text of the disputed term. Similar to the term "cost" that we recently considered in *Batzer*, 204 Or App at 319-22, the word "office" is an inherently flexible term. The relevant but diverse meanings of "office" are

> "a place where a particular kind of business is transacted or a service is supplied: as * * * b: the directing headquarters of an enterprise or operation, [or] c: the place where a professional man (as a physician or lawyer) conducts his professional business."

*Webster's Third New Int'l Dictionary* 1567 (unabridged ed 2002). Those meanings are so flexible that they lend nothing conclusive to our analysis. On the one hand, nothing in the dictionary definitions suggests other than that "an office" is "a place" that would move in tandem with a relocation of

where business is transacted, headquarters are located, or the professional person conducts his business. On the other hand, the definition concerns "*a* place," which does not preclude that the parties wrote "*the* Milne Construction Co. Office" because they specifically meant MCC's *then-current* location in Portland. "[T]he definite article 'the' functions as an adjective that denotes a particular, specified thing, not a general, unspecified class of things." *Arlington Ed. Assn.*, 196 Or App at 598 (internal quotation marks and citation omitted). Dictionary meanings do not eliminate the possibility that the parties meant "the Milne Construction Co. Office" to refer to the specific, tangible physical object, being the only building occupied by MCC in Portland and well known to all who participated in drafting the contract, and thus that plaintiff could maintain his office for his lifetime in the named building at his option at no cost. However, use of the definite article does not preclude defendants' interpretation that the emphasis of the phrase should be on "Milne Construction Co." That interpretation emphasizes the place where Milne Construction Co. *does business*, so that the place would move with the relocation of MCC's operations.

We turn next to the context of the disputed term within the agreement. The disputed phrase is in a single-sentence paragraph that was of secondary consideration to both the purpose of the 1990 contract—to sell MCC to defendant Bortolin and the purpose of the amendment—to reduce the selling price. Neither the contract nor the amendment defines "Office," even though the term is capitalized; "Office" is not used elsewhere, which might have provided clarification; and the final version of paragraph 13 has no illuminating dependencies on other conditions of the 1990 contract or the 1997 amendment. However, in the context of the amendment, a lifetime commitment of office services for a retired plaintiff, in business since 1953, at the office location known to him since 1964, was not an unreasonable tradeoff for a 44 percent reduction in the sales price for the company, with the Australian subsidiary included in the new price. We note that use of the phrase, "at his option," which seems to define plaintiff's unilateral right to choose whether to have the services, could plausibly mean that defendants did not have a

commensurate right to unilaterally change the place where they provided the services.

Defendants argue that plaintiff's interpretation violates the statutory maxim that a judge may not "insert what has been omitted" into contractual language. ORS 42.230. They claim that plaintiff needed to add at least one of the following: the specific address at 16th Avenue, a lease commitment, or an express condition that plaintiff could remain in the old location if MCC moved. However, neither party prevails on a single plausible interpretation of paragraph 13 without adding some clarifying language. Plaintiff need only have expanded the phrase to read "the *then-current* Milne Construction Co. Office" to have avoided ambiguity. Defendants also needed to add or change language in their favor, *e.g.*, "*a* Milne Construction Co. Office *in Portland*," considering that there were various company office locations and at least some were not intended to qualify. Furthermore, no lease commitment is required to support plaintiff's interpretation because plaintiff owns the building. Rather, the phrase "at his option" in paragraph 13 might both define and limit plaintiff's ability to oblige defendants to afford him office space in the 16th Avenue building. As long as plaintiff owns the building, it is plausible that plaintiff could remain there and defendants could cover the fair market cost of his space even after MCC chose to relocate.

Defendants also contend that plaintiff's construction of the disputed language must be shown to conflict with other terms of the agreement in order to establish that the disputed language is ambiguous. Mutually inconsistent language can demonstrate a patent ambiguity, but here we are concerned with a latent, or extrinsic, ambiguity that is particular to the meaning that the parties gave to their terms at contract formation. Inconsistency is a sufficient but not a necessary condition for ambiguity, *see Miller v. Miller*, 276 Or 639, 647, 555 P2d 1246 (1976); *Timber Access Ind. v. U.S. Plywood*, 263 Or 509, 514, 503 P2d 482 (1972), and the case law cited by defendants does not say otherwise.

We next consider whether extrinsic evidence of the circumstances of contract formation precludes plaintiff's claimed ambiguity. The mere presentation of plaintiff's

handwritten draft paragraph 13, all in capital letters and without the definite article to moderate "OFFICE," does not establish a particular meaning for the word "Office" in the final paragraph 13. The content of plaintiff's draft, however, is extrinsic evidence circumstantial to contract formation that adds information. Plaintiff's original proposal included *quid pro quos*: "as part of [the] agreement to reduction of purchase and redemption * * * until retained earnings have increased by [$]1,696,500." That language arguably suggests a purpose to paragraph 13; framed as a trade-off for the price reduction, a meaning that is favorable to plaintiff's work habits is plausible. Kight's testimony and contemporaneous writing to defendant Bortolin reinforce the parties' understanding of that tradeoff but also amplify the ambiguity. She wrote that he wants "the office here," "in this building," and "is used to coming here, is comfortable here, and will need someplace to go." If the "office thing" was the only issue, she could deal with it and the tradeoff was still a good deal. Kight recalls understanding at the time that plaintiff meant the 16th Avenue building. On the other hand, she wrote that she discounted his tie-in of office space to the price reduction as an example of plaintiff's "normal sarcasm."

Plaintiff's proposed paragraph 13 also specified a time constraint: Defendants were to provide the services to plaintiff until MCC added about $1.7 million to its retained earnings. In the course of final negotiations that are not known from the record, the parties eliminated the time constraint on services to plaintiff and added the definite article to the phrase "the Milne Construction Co. Office." Those changes, reflecting unknown negotiations and interim drafts, seem to work in plaintiff's favor. The record available to us does not reveal any compensating edits to the amendment as trade-offs in defendants' favor. The extrinsic evidence at least makes plausible an understanding that paragraph 13 was meant solely to operate in plaintiff's favor.

Various other aspects of the circumstances surrounding contract formation also make plaintiff's interpretation plausible. When the amendment was in negotiation, MCC's headquarters and sole Portland office had been at 16th Avenue for at least 33 years, MCC was the sole occupant, and the building displayed the company name. The

transaction participants were long-time company employees and their corporate attorney. Bortolin's primary office location was at Milne Canada, and the parties agree that they did not mean plaintiff would ever have to work from MCC's Canadian office, or in Australia. It is therefore plausible that such knowledgeable parties meant a proper name for the physical building in Portland when they referred to "the Milne Construction Company Office." Kight's testimony and notes suggest that Bortolin approved her initial response to the proposed paragraph 13, and that the other interested parties all wanted to draft against plaintiff. Defendant Bortolin had the personal knowledge and the incentive to add language to clarify MCC's right to move plaintiff's services to a location different from MCC's long-standing location, if that were the parties' intent.

Finally, plaintiff's proposal of paragraphs 13 to 15 was a last minute change. Plaintiff was traveling in New York, Kight typed drafting changes in Portland, defendant Bortolin communicated from his office in Canada, and the final language was negotiated by phone calls between plaintiff and Bortolin that did not include Kight. This extrinsic evidence reinforces that the participants' assumptions, based on long-term relationships, the speed of final negotiations, and the distance involved, at the very least could generate a latent ambiguity not considered by the parties at the time.

The meaning of "the Milne Construction Co. Office" in this contract is ambiguous. Plaintiff has raised a genuine issue as to that material fact, and hence the trial court erred in granting summary judgment to defendants.

Reversed and remanded.