**CIRCLE K STORES, INC., a Texas corporation, Plaintiff,**

v.

**Richard L. ZILLMAN, trustee of the Richard L. Zillman Family Trust; Richard L. Zillman and Cheryl Zillman, trustees of the Richard and Cheryl Zillman Revocable Trust, Defendants.**

**No. Civ. 10–6389–AA.**

United States District Court, D. Oregon.

Oct. 31, 2011.

J. Christopher Gooch, Fennemore Craig, P.C., Phoenix, AZ, Philip S. Van Der Weele, K&L Gates L.L.P., Portland, OR, for Plaintiff.

Norman R. Hill, Martinis & Hill, Salem, OR, for Defendants.

## OPINION AND ORDER

AIKEN, Chief Judge.

Plaintiff Circle K Stores, Inc. (Circle K) filed this diversity action against defendants seeking declaratory and injunctive relief and specific performance based on

defendants' breach of contract. In the alternative, Circle K seeks damages for breach of the duty of good faith and fair dealing. Defendants now move for summary judgment on all of Circle K's claims, and Circle K moves for partial summary judgment against defendants with respect to Circle K's claim for breach of contract. Defendants' motion is DENIED. Circle K's motion is GRANTED in part and DENIED in part.

## BACKGROUND

Circle K is in the business of operating convenience stores and fuel stations throughout the United States. On November 27, 1970, Circle K and defendants' predecessors in interest entered into lease agreements (the "Lease") for two separate properties in Salem, Oregon. Under the Lease, Circle K became a tenant at the two properties, which are located at 4781 Liberty Road SE and 2904 12th Street SE in Salem, Oregon (the "Leased Premises"). Circle K operates store number 2701278 at the 4781 Liberty Road location ("Store 1278") and operated store number 2700411 at the 2904 12th Street location ("Store 411").

The original term under the Lease was 20 years, with the original lease term ending on November 26, 1990. The Lease also provided Circle K with a renewal/extension option at the end of the lease terms. Further, the Lease granted Circle K the "right of first refusal" with respect to renewing or extending the lease terms and with respect to leasing or purchasing the property if defendants received a higher offer from a third party. *See* Lease, ¶¶ 3, 17 and Addendum.

On March 21, 1991, Circle K and defendants entered into two agreements (one for each of the properties), each entitled Lease Amendment and Extension Agreement ("First Extensions"). Among other items, the First Extensions changed the rent payable to the landlord and extended the terms of the Lease an additional ten years, through November 26, 2000. The First Extensions also granted Circle K options to renew the Lease for a period of five years each.

On January 20, 2000 and February 7, 2000, Circle K provided defendants written notification of its intent to exercise the first options under the First Extensions, which extended the Lease through November 26, 2005.

On March 8, 2001, Circle K and defendants entered into two agreements entitled Second Lease Amendment and Extension Agreement (collectively, the "Second Extensions"). The Second Extensions further modified the Lease.

On October 15, 2004 and October 27, 2004, Circle K provided defendants written notification of its intent to exercise the second options under the First Extensions, which extended the Lease through November 26, 2010. No additional extension option remained for Circle K to renew at the end of this lease term.

On February 3, 2010, Circle K sent defendants a letter requesting a five-year extension of the Lease, with two additional options to renew the Lease for five years after expiration of the new lease extension. At the time, Circle K was not aware of any effort by defendants to market or otherwise replace Circle K as a tenant at the end of the lease term. Defendants never responded to Circle K's letters.

On July 20, 2010, Circle K again sent its February 3, 2010 letters to defendants. Around the same time, defendants retained a broker to market the Leased Premises.

Circle K representatives spoke with defendant Richard L. Zillman on or around August 20, 2010 and reiterated Circle K's intent "to exercise its right of first refusal

on the Leases." Circle K maintains that defendants refused to engage in any meaningful negotiations with Circle K regarding extension of the Lease or a new lease of the Leased Premises. Defendants dispute that characterization.

In response to a demand from defendants' broker, Circle K obtained independent broker price options for the Leased Premises, which it provided to defendants' broker on October 20, 2010.

On November 10, 2010, defendants' broker rejected Circle K's offers and stated:

> [Defendants have] received offers that are significantly higher than that made by Circle K and at this time, [defendants feel] a counter-proposal would be unproductive.

Wilson Decl., Ex. P, p. 3.

Later that same day, the defendants' broker rejected Circle K's offers and stated:

> The [Defendants are] not interested in discussing any continuation of your occupancy at either location, and expect that you will be vacating the spaces on November 26th, 2010 per the terms of your existing lease. There is a new Lessee who may be interested in discussing acquisition of the FF & E within the stores to save you the expense and hassle of removing those items prior to you vacating.

Wilson Decl., Ex. P, p. 2.

In response to defendants' disclosure that they had both received other offers and entered leases with a new tenant, on November 10, 2010, Circle K made a demand on its right of first refusal and requested that defendants produce the third-party leases for evaluation: "As per the terms of our lease, we have a first right of refusal. Once this [offer from a third party] is presented to us for evaluation we will either elect to exercise or vacate." Circle K's Memo. in Support of Circle K's Cross–Motion, p. 10 (doc. 57).

On Tuesday, November 16, 2010, defendants disclosed to Circle K two letters of intent, one for each of the properties. Each letter of intent is dated November 8, 2010, and each letter of intent appears to be signed by a third-party lessee. However, when disclosing these letters of intent to Circle K, defendants denied that Circle K had a right of first refusal:

> These documents are being sent as an accommodation. Lessor does not acknowledge that Circle K has a valid First Right of Refusal. Any First Right that existed, expired 6 months prior to the expiration of the original lease term, in 1990.

Wilson Decl., Ex. Q, p. 1.

On November 17, 2010, Circle K attempted to exercise its alleged rights of first refusal by accepting the terms in the November 8, 2010 letters of intent offered by the third-party lessee.

On November 18, 2010, Circle K filed this action and sought a preliminary injunction and temporary restraining order, claiming it accepted the letters of intent and that defendants refused to negotiate in good faith. On November 22, 2010, the court granted the temporary restraining order. Also on November 22, 2010, defendants disclosed two partially-executed leases for the Leased Premises (the "Third–Party Leases").

On December 1, 2010, the court held a hearing on Circle K's motion for preliminary injunction. At the hearing, defendants produced fully-executed copies of the Third–Party Leases, which showed the leases were entered on November 9, 2010.

On December 6, 2010, 2010 WL 5101940, the court found a likelihood of success regarding Circle K's rights of first refusal and granted the preliminary injunction, thereby allowing Circle K to continue renting the Leased Premises so long as it pays

defendants the rental amounts offered under the Third–Party lease. Circle K was also granted until a certain date to accept or reject the Third–Party Leases. The parties were required to submit a joint status report by January 13, 2011 stating whether Circle accepted or rejected the Third–Party Leases.

On December 10, 2010, Circle K sent a letter to defendants purporting to accept the Third–Party Lease as it related to Store 1278 located at the Liberty Road location, and rejecting the Third–Party Lease as it related to the lease for Store 411 located at the 12th Street location. Specifically, Circle K wrote, in relevant part:

> Circle K *accepts* the general terms [sic] the lease dated November 9, 2010 for the property located at 4781 Liberty Road, SE, Salem, OR (Circle K store # 2701278). As the Court noted during the December 1, 2010 hearing, the leases presented to Circle K under its right of first refusal do not account for the fact that Circle K is a national, public-traded company. Therefore, Circle K requests the following minor modifications and clarifications prior to signing the lease:
>
> 1. Personal Guaranty. Given the fact that Circle K is a publicly traded company, provision of a personal guaranty would be inappropriate. Nevertheless, in order to provide the owner with the necessary security for the lease, Circle K is willing to provide a corporate guaranty, in the form attached hereto as Exhibit A.
>
> 2. Trade Equipment. Various sections of the lease address possession of equipment located on the premises, including, but not limited to section 16.2. These sections provide that specified equipment may revert to the owner under certain circumstances with an exclusion for speci-fied "Trade Equipment." Prior to signing the lease, Circle K will prepare a list of designated "Trade Equipment" for the location and requests that the list be attached to and incorporated in the lease document.
>
> 3. Percentage Rent. Typically, Circle K negotiates with landowners regarding the method for computation and payment of percentage rent. As such, Circle K has established computer protocols and accounting practices to accommodate payment of percentage rent. In order to facilitate Circle K's prompt and accurate payment of percentage rent under lease sections 3.1.2, 3.1.2.1, 3.1.3, 3.1.4 and 3.1.5, Circle K requests that the owner accept payment according to the format set forth in the spreadsheet attached hereto as Exhibit B. Circle K believes that this format accurately captures the percentage rents required under the lease and use of the format will not materially alter the lease terms.
>
> 4. Lease Term and Commencement. The November 9, 2010 lease does not require the tenant's possession until 2011. Given the fact that Circle K will continue as tenant from November 27, 2011 forward, Circle K requests that the parties modify the lease term referred to in sections 2.1 and 2.2 to coincide with the expiration of Circle K's previous lease (November 26, 2010) with a corresponding end to the lease term.

Circle K thus abandoned any interest in Store 411, and that lease is no longer at issue.

On December 13, 2010, defendants sent Circle K a letter stating that Circle K's purported acceptance was ineffective because it contained additional and modified

terms and, therefore, did not comply with defendants' offer. Consequently, defendants rejected Circle K's purported acceptance of the Third–Party Lease's terms. In that same letter, defendants suggested that all parties engage a qualified mediator to assist the parties in resolving their issues.

Shortly thereafter, on December 21, 2010, defendants received a new proposal from a new tenant offering to lease the Liberty Road store for more money. Defendants were unable to pursue the offer due to the injunction entered by the court.

On December 29, 2010, Circle K sent defendants another letter expressing its disagreement with defendants' assertion that Circle K's acceptance was ineffective. Circle K stated:

> To eliminate any further confusion, Circle K reiterates that it accepted the terms of the November 9, 2010 lease for the Liberty Road location. Please forward a complete copy of the lease for Circle K's signature. Circle K will sign the lease, provide the required list of Trade Equipment and sign a personal guaranty in the form attached to the November 9, 2010 lease.

On April 21, 2011, Circle K filed an Amended and Supplemental Complaint seeking a declaration that: (1) the Lease grants Circle K a right of first refusal; (2) defendants breached the Lease by entering into the Third–Party Leases and failing to present the Third–Party Leases to Circle K absent Court order; (3) Circle K executed a timely, unconditional, valid acceptance of the Third–Party Leases under Circle K's right of first refusal; and (4) defendants breached the Circle K Lease by failing to acknowledge Circle K's acceptance of the Third–Party Lease terms.

Circle K continues to occupy the Liberty Road location as a paying tenant under the terms of the Third–Party Lease in accordance with the preliminary injunction.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Motions for partial summary judgment are evaluated using the same standard. *Id.* The Court's role is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute involving a material fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* 477 U.S. at 248, 106 S.Ct. 2505. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993). The materiality of a fact is determined by the substantive law governing the claim. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

The moving party has the burden of informing the court of the basis for its motion and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Upon the moving party's meeting that burden, the nonmoving party must then go beyond the pleadings and identify facts which show a genuine issue of fact for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the

light most favorable to the nonmoving party. *T.W.*, 809 F.2d at 630.

A cross-motion for summary judgment requires the court to apply the same standard as it does for an individual summary judgment motion. *Creech v. N.D.T. Indus., Inc.*, 815 F.Supp. 165, 166 (D.S.C. 1993). The court must therefore rule on each motion independently. *Creech*, 815 F.Supp. at 166–67. "The granting of one motion does not necessarily warrant the denial of the other motion, unless the parties base their motions on the same legal theories and same set of material facts." *Stewart v. Dollar Federal Sav. and Loan Ass'n*, 523 F.Supp. 218, 220 (S.D.Ohio 1981) (citing *Schlytter v. Baker*, 580 F.2d 848, 849 (5th Cir.1978)).

### DISCUSSION

Defendants move for summary judgment on Circle K's claims for breach of contract and breach of the covenant of good faith and fair dealing. Circle K moves for partial summary judgment against defendants with respect to Circle K's claim for breach of contract. Because both Circle K and defendants move for summary judgment on Circle K's claim for breach of contract, the court treats both motions for summary judgment as arising from the same legal theories and the same set of undisputed facts. The granting of one party's motion, therefore, warrants denial of the other party's motion.

### I. Breach of Contract

Circle K's breach of contract claim has two parts. First, Circle K insists that the Lease obligates defendants to disclose to Circle K any offers to lease the properties that defendants received during the term of the Lease and to allow Circle K the right of first refusal. Circle K argues that defendants failed to honor this right, thereby breaching the Lease.

Second, Circle K insists it accepted the third-party offer and that defendants' refusal to acknowledge this acceptance also constitutes a breach of the Lease.

### A. The Lease Grants Circle K a Right of First Refusal and Defendants' Failure to Honor this Right Constitutes a Breach of the Lease

Courts normally follow three steps when interpreting a contractual provision. *Yogman v. Parrott*, 325 Or. 358, 361, 937 P.2d 1019 (1997). However, at the summary judgment stage, the court need only complete step one: determine what the words of the contract say and whether the disputed provision is ambiguous. *Yogman* 325 Or. at 361, 937 P.2d 1019; *Milne v. Milne*, 207 Or.App. 382, 388, 142 P.3d 475 (2006). If the provision at issue is unambiguous, its construction is a matter of law for the court and summary judgment is appropriate. *May v. Chicago Ins. Co.*, 260 Or. 285, 292, 490 P.2d 150 (1971); *Milne*, 207 Or.App. at 388, 142 P.3d 475. But, if the provision at issue is ambiguous, summary judgment must be denied. *Milne*, 207 Or.App. at 388, 142 P.3d 475.

"Words or terms of a contract are ambiguous when they reasonably can, in context, be given more than one meaning." *Yogman*, 325 Or. at 363–64, 937 P.2d 1019. In order to determine whether a provision is ambiguous, the court looks to the text to determine what the contract itself says. *Id.* at 361, 937 P.2d 1019. Stated differently, the court "looks at the four corners of [the] written contract, and considers the contract as a whole with emphasis on the provision or provisions in question." *Id.* (citing *New Zealand Ins. v. Griffith Rubber*, 270 Or. 71, 75, 526 P.2d 567 (1974); *Devereaux v. Cockerline*, 179 Or. 229, 240, 170 P.2d 727 (1946); *Arment v. Yamhill Cnty.*, 28 Or. 474, 479, 43 P. 653

(1896)). In addition to examination of the text and context, the court may consider "the circumstances underlying the formation of a contract to determine whether a particular contractual provision is ambiguous." *Batzer Const., Inc. v. Boyer,* 204 Or.App. 309, 317, 129 P.3d 773 (2006).

 The crux of the parties' dispute is the meaning of three paragraphs contained in the original 1970 Lease and an accompanying Addendum. Circle K maintains that ¶ 17 of the Lease unequivocally grants Circle K the exclusive "first option" to lease the properties on the same terms as those contained in a bona fide offer that defendants wish to accept. Based on the language of the Lease, I agree.

In ¶ 17, the Lease specifically grants Circle K the "exclusive" right to accept the terms of lease or purchase offers received by defendants:

17. OPTIONS TO PURCHASE OR LEASE: If the Lessor, *at any time during the term of this Lease or any renewal or extension thereof receives a bona fide offer to . . . lease* (for a term to begin subsequent to the present term or any extension or renewal thereof) the demised premises and/or equipment and Lessor desires to accept said offer, Lessor agrees to give Lessee immediate notice in writing of such offer, setting forth name and address of the proposed purchaser or Lessee who has made the offer with a full disclosure of all terms and options thereof. *Lessee shall have the exclusive first option to purchase or lease the demised premises and/or equipment within fifteen (15) days after receipt of said notice on the same terms of any such proposal.* No sale, lease or transfer of title to said premises and/or equipment shall be binding on Lessee

unless and until these requirements are fully complied with by Lessor.

Wilson Decl., Ex. A, p. 2 (emphasis added).

Notwithstanding the express language of ¶ 17, defendants argue that an Addendum to the 1970 Lease modified and essentially replaced ¶ 17, and thus any right of first refusal held by Circle K expired six months before the end of the first lease term in 1990. However, defendants' argument is belied by the plain language of the Lease and the Addendum and by the parties' subsequent extension of the Leases.

The Addendum relied on by defendants is incorporated by reference into ¶ 3 of the Lease, a paragraph which discusses renewal options at the end of the original lease term:

3. TERM AND RENEWAL OPTION: . . . Lessee shall have and is hereby granted a total of *See Addendum* successive option to extend the term of this lease for any period of time not exceeding five (5) years for each such option upon the same covenants and conditions as are herein provided . . .

Rather than identify the number of successive renewal or extension options available to Circle K, the Addendum granted Circle K a "right of first refusal" to negotiate the renewal or extension of lease terms:

3. RENEWAL OPTIONS: Lessee shall have the right of first refusal in any future negotiating on the renting of the lease premises at the end of the original term of this lease, said right of first refusal to expire six months prior to the end of the lease term.

Wilson Decl., Ex. A, p. 4.

Notably, ¶ 17 of the Lease does not reference or incorporate the Addendum. Further, the Addendum is numbered "3" and labeled "RENEWAL OPTIONS," thus corresponding with ¶ 3, "TERM AND RENEWAL OPTION." Moreover, while the Addendum uses the language "right of first refusal" when referencing future re-

newal negotiations, ¶ 17 describes an "exclusive first option to purchase or lease" when and if defendants receive a bona fide offer from a third party. Thus, under the language of the Lease and the Addendum, the "right of first refusal" identified in the Addendum refers to Circle K's right to first negotiate and/or refuse a renewal or extension of the Lease, not the "first option" to purchase or lease should defendants receive an offer from a third party.

Therefore, regardless of Circle K's rights under ¶ 3 and the Addendum to negotiate and/or refuse extension terms before defendants marketed the properties, the language of the Addendum does not extinguish Circle K's rights and defendants' obligations under ¶ 17. Defendants' competing interpretation—that the Addendum modified and superseded ¶ 17—would require Circle K to exercise its "exclusive first option to lease or purchase" even if defendants did not receive a bona fide offer from a third party. Such an interpretation is contrary to the language of ¶ 17 and would render the entirety of ¶ 17 meaningless. *See N. Pac. Ins. Co. v. Hamilton,* 332 Or. 20, 22 P.3d 739 (2001) (a contract "must be viewed by its four corners and considered as a whole" and provisions "must be construed to determine if and how far one clause is modified, limited or controlled by others") (quoting *Denton v. Int'l Health & Life,* 270 Or. 444, 449–50, 528 P.2d 546 (1974)).[1]

Furthermore, the provisions of the Lease, including ¶ 17, were extended when the parties subsequently modified and extended the lease terms. The first extension agreements explicitly provided that "all other conditions and covenants of said

primary Lease dated July 27, 1970, shall remain in full force and effect and are hereby ratified and confirmed." Wilson Decl., Ex. C, p. 2. The parties also executed and recorded a Memorandum of Lease Extension in connection with the first extension agreements which stated: "The purpose of this Memorandum of Lease Extension is to give record notice to the Lease Extension and of the rights created thereby, all of which are hereby confirmed." Wilson Decl., Ex. E, p. 1. Similarly, the second modification agreements provided that "[e]xcept as specifically amended hereby by [sic], all other conditions and covenants of the Lease shall remain in full force and effect and are hereby ratified and confirmed." Wilson Decl., Ex. K, p. 2. Thus, Circle K's rights under ¶ 17 did not expire at the end of the original lease term.[2]

Accordingly, when defendants received a bona fide lease offer from a third-party lessee on November 9, 2010 and was inclined to accept it, defendants were required to notify Circle K of the offer and allow Circle K fifteen days to decide whether to lease the properties on the same terms or vacate the premises. Defendants' failure to comply with ¶ 17 of the Lease constitutes a breach of the Lease, therefore Circle K's motion for partial summary judgment on this issue is granted.

**B. Whether Circle K Effectively Accepted the Terms of the Third–Party Lease is a Genuine Issue of Material Fact**

■ The next issue is whether Circle K effectively accepted the Third–Party Lease

---

1. Defendants also argue that ¶ 17 applies to only purchase offers; however, this argument is contradicted by the plain language of ¶ 17.

2. Further, the Memorandum of Lease Extension specifically acknowledged that Circle K retained a "right of first refusal option."

Wilson Decl., Ex. E, p. 1. Thus, even if Circle K's rights under ¶ 17 were modified by the Addendum, those rights were extended and Circle K exercised such rights by stating its intent to enter into renewal negotiations in February 2010.

as to the Liberty Road location. The crux of this dispute again involves ¶ 17 of the Lease, which specifically grants Circle K the "exclusive first option" to accept the terms of lease or purchase offers received by defendants "within fifteen (15) days after receipt of said notice on the same terms of any such proposal." Wilson Decl., Ex. A, p. 2. Circle K further maintains that its acceptance of the Third–Party Lease was timely, unequivocal, and binding. To support this assertion, Circle K relies on its letter of December 10, 2010, which stated that Circle K accepted the "general terms" of the Third–Party Lease.

Circle K insists it affirmatively and unequivocally accepted the terms of the Third–Party Lease, and the remaining paragraph of its letter seeks only to clarify four discrete issues relating to the Third–Party Lease. Circle K characterizes its clarifications as follows:

> First, Circle K sought to clarify acceptable security in lieu of a personal guaranty, due to its corporate structure.... Second, Circle K confirmed that it would provide a list of Trade Equipment as required by Section 16.2 of the Third–Party Lease.... Third, Circle K sought to clarify whether its corporate forms for reporting sales data used to calculate percentage rent would be acceptable to defendants.... Finally, Circle K sought to confirm the start date of the Third–Party Lease.

Circle K's Memo. in Support of Circle K's Cross–Motion, pp. 24–25 (doc. 57).

Circle K maintains that these clarifications do not represent changes and that its acceptance of the new lease was not conditioned on defendants' acceptance of Circle K's requests. To prove this, Circle K points to its letter of December 29, 2010, wherein it ultimately accepted the original terms of the Third–Party Lease.

Defendants, however, characterize the December 10, 2010 letter as a counter-offer to the terms of the Third–Party Lease, or as an attempt to renegotiate its terms. Defendants argue that Circle K qualified its acceptance by carefully limiting it to the "general terms" of the lease when it "was required to accept all of the terms" of the lease. Dfs.' Reply to Circle K's Memo. in Opp., p. 3 (doc. 58) (citing *Stevens v. Foren*, 154 Or.App. 52, 57, 959 P.2d 1008 (1998)). Defendants also emphasize Circle K's request that the "minor modifications and clarifications" be made "prior to signing the lease." Moreover, defendants argue, nothing in the letter states that Circle K will agree to the lease, even if defendants do not agree to the changes.

Beyond the form of the requests in the December 10, 2010 letter, defendants also take issue with their substance. Defendants insist that Circle K's modifications address terms that, if accepted by defendants, would not match the original terms of the Third–Party Lease and would therefore not comply with ¶ 17's requirement that Circle K accept "the *same* terms of any such proposal" (emphasis added). According to defendants, an acceptance "must be in the precise terms of the offer and if a new provision is suggested, it is considered a counteroffer." Dfs.' Reply to Circle K's Memo. in Opp., p. 10 (doc. 58) (citing *Ellingsworth v. Shannon*, 161 Or. 106, 110, 88 P.2d 293 (1939)). For example, defendants argue that Circle K's desire to substitute a corporate guaranty for a personal guaranty constitutes a guaranty fundamentally different from the guaranty attached to the Third–Party Lease. Defendants also maintain that Circle K's request for a change in the percentage rent reporting format was a major change rather than a mere request for clarification. Defendants further argue that Circle K's request for clarification regarding the start date of the Third–Party Lease changed the lease terms.

Defendants acknowledge Circle K's eventual acceptance of the new lease in its December 29, 2010 letter, but maintains that the right's fifteen day period had passed, thereby rendering the acceptance untimely. Therefore, according to defendants, Circle K's letter of December 10, 2010 did not affirmatively accept all of the terms of the new lease and therefore constituted a counter-offer. As such, defendants insist that Circle K never properly accepted the terms of the Third–Party Lease.

■ In order for Circle K to have properly accepted the Third–Party Lease, its "acceptance must be positive, unconditional, unequivocal and unambiguous, and must not change, add to, or qualify the terms of the offer." *Wagner v. Rainier Mfg. Co.*, 230 Or. 531, 538, 371 P.2d 74 (1962); *see also Blakeslee v. Davoudi,* 54 Or.App. 9, 15, 633 P.2d 857 (1981) (applying the *Wagner* rule to exercise of options). I find that whether Circle K's acceptance meets these requirements ultimately is a genuine issue of material fact. For example, it would not be unreasonable for a jury to find that Circle K's December 10, 2010 letter constituted an affirmative acceptance with minor requests for clarification, as Circle K argues. A reasonable jury might also give weight to the fact that Circle K never refused to perform under the terms of the Third–Party Lease In *Stevens,* for example, the Oregon Court of Appeals held that the optionee's acceptance of a third-party contract was not valid, and was in fact a rejection, because the optionee refused to complete a requirement specifically included in the terms of the offer, and the optionee was required to "match all terms of the offer." *Stevens,* 154 Or.App. at 60, 959 P.2d 1008. Here, a reasonable jury could find that nothing in Circle K's letter constitutes an outright refusal. Furthermore, the first paragraph, stating, "Circle K *accepts* ...," could be construed to mean that the four paragraphs at issue are more like indicia of performance—demonstrating Circle K's willingness to perform—rather than an acceptance conditioned on defendants' acceptance of the requested changes.

On the other hand, it would also be reasonable for a jury to find that Circle K's letter ultimately constitutes a counter-offer or an acceptance conditioned on defendants' acceptance of the requested changes. Circle K accepted "the *general terms*" of the Third–Party Lease and requested "modifications and clarifications *prior to signing the lease* ...," potentially casting doubt on Circle K's purported unconditional acceptance of all of the terms. Finally, a jury may reasonably find that the requested clarifications and modifications were not minor, given the evidence presented by defendants. Dfs.' Reply to Circle K's Memo. in Opp., pp. 6–10 (doc. 58). If Circle K's requested changes qualify the offer, then the requested changes must be considered a counter-offer—not an acceptance. *See C.R. Shaw Wholesale Co. v. Hackbarth,* 102 Or. 80, 96, 201 P. 1066 (1921) ("The only condition to the offer which can be added in the acceptance is one which does not qualify the offer in legal effect."). However, these are factual issues not appropriately resolved by the court on summary judgment.

In sum, the effectiveness of Circle K's purported acceptance of the terms of the Third–Party Lease is a genuine issue of material fact and both parties' motions for summary judgment are denied as to this specific issue.

### II. Breach of Covenant of Good Faith and Fair Dealing

■ Defendants also move for summary judgment on Circle K's claim for breach of the covenant of good faith and

fair dealing. All contracts contain an implied covenant of good faith and fair dealing. *Uptown Heights Assoc. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 645, 891 P.2d 639 (1995). The covenant of good faith and fair dealing ensures that each party receives the anticipated benefits of their bargain. *See Best v. U.S. Nat'l Bank*, 303 Or. 557, 563, 739 P.2d 554 (1987). In determining whether there has been a breach of this covenant, the court evaluates a party's conduct in light of the reasonable expectations of the parties. *Id.*

 The success of defendants' motion depends on the court finding that there is no right of first refusal to accept the Third–Party Lease terms. Because this court finds a valid right of first refusal, defendants have not met their burden of demonstrating the absence of a genuine issue of material fact. Indeed, as Circle K notes, there are fact issues surrounding this claim and the parties' reasonable expectations. As Circle K has shown that a genuine issue of material fact exists, defendants' motion as to this claim is denied.

### CONCLUSION

For these reasons, defendants' Motion for Summary Judgment (doc. 47) is DENIED, and Circle K's Cross–Motion for Partial Summary Judgment (doc. 56) is GRANTED in part and DENIED in part.

IT IS SO ORDERED.